UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v-

MOBUTU THORNHILL,

               Defendant.

Case No. 11-CR-958 (KMK)

OPINION AND ORDER

Appearances:

Rebecca Mermelstein, Esq.
Assistant United States Attorney
United States Attorney's Office, Southern District of New York
*Counsel for the Government*

Andrew G. Patel, Esq.
Lauren Sarah Kessler, Esq.
Law Office of Andrew G. Patel
New York, New York
*Counsel for Defendant Mobutu Thornhill*

KENNETH M. KARAS, District Judge:

On June 20, 2012, Defendant Mobutu Thornhill ("Defendant") was convicted of being a

felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), in a trial before this Court.

Defendant now brings this Motion for a New Trial pursuant to Rule 33 of the Federal Rules of

Criminal Procedure, alleging that his trial counsel's ineffectiveness rendered his trial

fundamentally unfair, in violation of the Sixth Amendment of the United States Constitution.

For the reasons given herein, Defendant's Motion is denied.

## I.  BACKGROUND

Prior to his trial before this Court, Defendant was acquitted in state court of criminal

possession of a weapon in the second degree.  Because Defendant's Motion depends in large part

on the argument that the absence of certain testimony at his federal trial explains the difference

in outcomes between his state and federal trials, the Court will describe both trials in some detail

before proceeding to its discussion of the pertinent legal principles.

A. Factual Background

1. Defendant's State Trial

On September 17, 2010, a Westchester County grand jury returned an indictment against

Defendant, charging him with criminal possession of a weapon in the second degree, in violation

of New York Penal Law § 265.03; criminal possession of a weapon in the third degree, in

violation of New York Penal Law § 265.02; and resisting arrest, in violation of New York Penal

Law § 205.30. (State Trial Tr. 170, 413–14; Def.'s Mem. of Law in Supp. of Mot. for a New

Trial ("Def.'s Mem.") 2 (Dkt. No. 24.) Trial began on March 23, 2011. (State Trial Tr. 126.) In

her opening statement, Assistant District Attorney Nadine Nagler ("ADA Nagler") told the jury

that "[o]n February 15, 2010, [Defendant] had a gun and he got caught. Tried not to get caught,

but he got caught. And that's how simple this case is." (*Id.* at 170.) Defendant's state-trial

counsel, Theresa M. Gerardi ("Ms. Gerardi"), responded with a brief opening statement of her

own, in which she succinctly framed her trial strategy. Ms. Gerardi "ask[ed] [the jury] that

[it] . . . keep the District Attorney to her burden of proof . . . and remember that [Ms. Gerardi]

[did not] have any burden to prove or disprove anything." (*Id.* at 175.) She said that once the

jury "listen[ed] to all of the evidence in [the] case, the lack of evidence, the insufficiency of the

evidence," it would be brought "to the only just and honest verdict that there [could] be, and that

[would] be a verdict of not guilty." (*Id.*)

In support of the People's case, ADA Nagler called four witnesses, including three of the

police officers who had arrested Defendant, as well as a ballistics expert. The first prosecution

witness to testify was one of these arresting officers, Officer Mario Stewart of the Mount Vernon

Police Department ("Officer Stewart").  (*Id.* at 176.)  Officer Stewart recounted that early in the

morning on February 15, 2010, he was on patrol in the area of Mount Vernon in which a bar

called The Calabash was located, when he heard "loud yelling and screaming" coming from the

bar's direction.  (*Id.* at 180, 182.)  "[W]hat particularly caught [his] eye . . . was a lady in the

middle of the roadway frantically waiving her hands . . . trying to get [his] attention."  (*Id.* at

183.)  After Officer Stewart activated his emergency lights and pulled up beside her, she pointed

to a man in the vicinity wearing a green jacket, and yelled to Officer Stewart that the man "[had]

a gun."  (*Id.*)  At trial, Officer Stewart identified the man in question as Defendant.  (*Id.*)  Officer

Stewart recalled that when Defendant heard the woman yell, he looked in the direction of Officer

Stewart and the woman and began walking away, with his left hand "waiving [sic] back and

forth," while "his right hand was just straight down at his side."  (*Id.* at 184–85.)  Officer Stewart

then yelled to Defendant, "police, stop," and began following him.  (*Id.* at 186.)  Defendant did

not stop, even though Officer Stewart asked him to do so several additional times.  (*Id.*)  Once

Officer Stewart was approximately two or three feet behind Defendant, Officer Stewart was

"able to see that [Defendant] . . . had a brown handle of some object . . . in his right hand."  (*Id.*)

When another patrol car "stopped in front of [Officer Stewart] and [Defendant] in the roadway,"

Defendant "made an . . . abrupt left turn[,] dropping [a] firearm into the snow and then walking

towards [Officer Stewart's] direction."  (*Id.* at 187.)

Two other Mount Vernon Police Department officers exited the vehicle that had just

arrived: Officers Murashea Bovell ("Officer Bovell") and Eric Byrwa ("Officer Byrwa").  (*Id.* at

188.)  Officer Stewart saw Officer Bovell walk "directly to the area where [Officer Stewart saw

Defendant] drop the firearm," at which point Officer Bovell yelled to Officer Stewart, "I got a

3

gun." (*Id.*)  Officer Stewart then shouted for Officer Byrwa to "[g]ive [him] a hand" and "started ordering [Defendant] to get on the ground," but Defendant "refused to do so." (*Id.*)  Officer Stewart executed a "leg sweep," a type of "tripping maneuver," to "take [Defendant] down to the ground." (*Id.* at 188–89.)  Defendant "continued to actively resist arrest by tucking his hand underneath his body." (*Id.* at 188.)  With the assistance of Officer Byrwa and another officer, Officer Stewart was finally "able to get [Defendant] into cuffs." (*Id.*)  Officer Stewart described the area in which these events took place as "well-lit," and noted that there was no one else in the area wearing a green jacket at the time. (*Id.* at 190–91.)  At trial, he identified a firearm that ADA Nagler introduced into evidence as "[t]he gun . . . that [Defendant] dropped that was recovered at the scene." (*Id.* at 191.)  Officer Stewart demonstrated for the jury the manner in which Defendant had carried the gun in his right hand. (*Id.* at 195–97.)  He also identified as accurate depictions of the location where the incident took place a number of photographs that ADA Nagler showed him, and helped ADA Nagler recreate the events as he had described them through the use of a diagram and the positioning of himself and others around the courtroom. (*Id.* at 197–210.)  The photographs were published to the jury, and the jury was also given an opportunity to visually inspect the gun from a distance. (*Id.* at 212.)

Ms. Gerardi then cross-examined Officer Stewart.  Among other responses, she elicited from Officer Stewart that the woman who informed him that Defendant had a gun was "pointing towards [a] crowd," to an "area" with "more than one person," (*id.* at 223); that Officer Stewart "never got [the woman's] name . . . [,] address[,] or phone number," (*id.* at 224); that there were "other people . . . on the street that were near the man with the green jacket when [Officer Stewart] first saw him," (*id.* at 227); that Officer Stewart "never actually took [the] green jacket from [Defendant]" or "put [it] into evidence," (*id.*); that Defendant did not run away from

Officer Stewart once he heard Officer Stewart ask him to stop, but instead "kept walking

straight," (*id.* at 228–29); and that Officer Stewart could not make out that Defendant was

holding a gun before he dropped it, only that he was carrying an object with a brown handle, (*id.*

at 229–30).

      After Officer Stewart stated that there was only one suspect in the case, Ms. Gerardi

directed his attention to the police report that he filled out after the incident, which he

acknowledged was "accurate" and "true." (*Id.* at 231.)  Ms. Gerardi gave Officer Stewart time to

refresh his recollection, and then asked him how many suspects he wrote down in his report, to

which he responded, "It says two, ma'am." (*Id.* at 234–35.)  In response to questioning, Officer

Stewart also stated that, based on his recollection at the time of the incident, Defendant had a

"medium to large build." (*Id.* at 236–37.)  But when Ms. Gerardi asked Officer Stewart what he

wrote down in his report about the suspect's build, he responded, "The report said small." (*Id.* at

237.)  Officer Stewart also said that he "used a computer to complete [his] report," and that

"[m]istakes do happen." (*Id.*)

      Ms. Gerardi then asked Officer Stewart to characterize the firearm that was entered into

evidence. (*Id.* at 242–43.)  Specifically, she asked him whether the firearm was "a pistol," to

which Officer Stewart responded, "Yes, ma'am." (*Id.* at 243.)  She then asked him whether "it

could also be a handgun," to which he responded, "It is the same thing, ma'am." (*Id.*)  When

Officer Stewart testified that he signed the evidence property invoice for the gun, that the invoice

was accurate, complete, and "[had] everything in [it] that it should," and that he filled it out in

the course of the investigation, Ms. Gerardi asked Officer Stewart whether it was "recorded in

there that this is a .22 caliber long rifle," to which Officer Stewart responded, "Yes, ma'am."

(*Id.* at 244.)  Officer Stewart also confirmed that he signed the superseding felony complaint,

which described the weapon that Defendant allegedly possessed as a "Smith & Wesson .22 caliber long rifle." (*Id.* at 245.) This line of questioning prompted Officer Stewart to ask the court if he could "explain what the long rifle is," which request the court granted, over Ms. Gerardi's objection. (*Id.* at 245–46.) Officer Stewart said that "[t]he reason why the . . . firearm is called a long rifle is because it uses a .22 caliber long rifle ammunition," but that "[i]t is a handgun. It is a pistol." (*Id.* at 246.)

Ms. Gerardi also drew out from Officer Stewart his recollection that the snowbank into which Defendant dropped the gun was two-to-three-feet high, but that he had previously testified at a preliminary hearing that he "could not recall" the snowbank's height, (*id.* at 259–61); that he had not mentioned anything about seeing the brown handle of an object in Defendant's hand in his police report, and in fact had not done so until he testified before the grand jury, (*id.* at 264–65); that even though he had submitted the gun to a laboratory to test for operability, he had never done so to test for fingerprints or DNA, despite the fact that the gun's bullets must have been loaded by hand, one-by-one, (*id.* at 268–69, 272); and that he had never performed a gunshot-residue test on Defendant, (*id.* at 273).

On re-direct, Officer Stewart testified that he had filed a "supplemental report" in addition to the report about which Ms. Gerardi asked him, and that in his supplemental report, he had listed "the suspect" as Defendant, and had not listed any other suspects. (*Id.* at 283.) He also stated that "the only way [that he could] explain" why he wrote down that there were two suspects in his original report was that there had been a "typographical error." (*Id.* at 284.) At ADA Nagler's direction, Officer Stewart also read the identifying information stamped into the barrel of the gun: ".22 long rifle CTG." (*Id.* at 287 (internal quotation marks omitted).) Responding to Ms. Gerardi's questions about gunshot residue, ADA Nagler asked Officer

6

Stewart whether Defendant had been charged with "actually shooting anyone that night," to which Officer Stewart replied, "No, ma'am."  (*Id.*)  In a brief re-cross, Officer Stewart admitted to Ms. Gerardi that he had made "some . . . typographical errors" in his original report.  (*Id.* at 289.)

ADA Nagler next called Officer Byrwa, who largely corroborated Officer Stewart's testimony.  (*Id.* at 290.)  He stated that on February 15, 2010, he was patrolling near The Calabash with his partner Officer Bovell, "just to make sure that the bar dismissed orderly."  (*Id.* at 292–94.)  When he turned onto the street on which The Calabash was located, he "saw a large crowd, it obviously was from the patrons from the bar, everyone was screaming and yelling." (*Id.* at 294.)  He got out of his car and heard someone shout, "There's a gun, there's a gun."  (*Id.*) At that point, Officer Stewart "directed [Officer Byrwa] over to his attention where [Officer Stewart] was with [Defendant]," and Officer Byrwa "went over to . . . Officer Stewart[,] where [Officer Byrwa] helped [Officer Stewart] apprehend [Defendant]."  (*Id.*)  Echoing Officer Stewart, Officer Byrwa described the difficulty that he and Officer Stewart had in placing Defendant under arrest, given the extent to which Defendant resisted.  (*Id.* at 295.)  Officer Byrwa also identified the gun introduced into evidence as "the firearm that [he] observed in a snowbank . . . the night that [he and Officer Stewart] apprehended [Defendant]."  (*Id.* at 296.) He did not observe the gun until "after [Defendant] was apprehended."  (*Id.*)  He "believe[d] [that Officer Bovell] was standing over the gun, making sure it was secure" during the time that Officer Byrwa and Officer Stewart were attempting to arrest Defendant.  (*Id.*)

Ms. Gerardi's cross-examination of Officer Byrwa followed a similar format to her cross-examination of Officer Stewart.  In response to Ms. Gerardi's questioning, Officer Byrwa admitted that he "never actually saw [Defendant] dropping anything," or "anything in his hand,"

7

(*id.* at 299); that he never "actually [saw] Officer Bovell retrieve the firearm," (*id.* at 302); that he never requested that fingerprints or DNA be taken from the gun, (*id.* at 303–04); and that he never conducted a gunshot-residue test on Defendant's clothing or hands, (*id.* at 304).

Officer Bovell was the People's next witness.  (*Id.* at 307–08.)  Unlike his partner Officer Byrwa, Officer Bovell testified that he had in fact "observed a black male wearing a green coat holding a black handgun [in his right hand], emerging from a crowd," a person he also identified at trial as Defendant.  (*Id.* at 311–12.)  According to Officer Bovell, Defendant was "walking at some point and then he stopped, and once he stopped, he had then dropped the weapon onto the floor."  (*Id.* at 312.)  While holding the gun, Officer Bovell explained to the jury that the gun's slide "cocks back, which it slides back, which the gun is safe and empty.  There is not a live round in the gun.  But at the time when [Officer Bovell] saw [Defendant] with the weapon, it was not in [that] position . . . ."  (*Id.* at 313.)  In other words, Officer Bovell testified that when he saw Defendant with the gun, the gun was in such a position as to suggest that it was loaded.  With ADA Nagler's assistance, Officer Bovell also demonstrated the angle from which he had observed Defendant walking, and the manner in which Defendant had carried the gun.  (*Id.* at 314–15.)  Officer Bovell said that Defendant was "surprised," and that he "just . . . let [the gun] fall to the ground . . . .  He did not throw it, he dropped it from his hand . . . ."  (*Id.* at 316.)  Officer Bovell also confirmed that "from the time that [he] first saw [Defendant] with [the] gun in his hand, until the time that [he] saw [Defendant] drop it," he never "los[t] sight of [Defendant]," and that "as soon as [Defendant] dropped the weapon," Officer Bovell "exited [his] police vehicle towards [the] direction" of "where [Defendant] dropped the gun into the snowbank," and then saw the same gun that Defendant had been holding in the snowbank on the ground.  (*Id.* at 316–17.)

8

Officer Bovell further testified that he "then observed . . . that there was a large crowd surrounding the weapon in the area," so he "quickly picked up the weapon" for his and his fellow officers' safety, as well as the safety of the nearby civilians, as he was not aware "whether or not . . . [Defendant] had a friend or somebody [who might have] pick[ed] up the weapon." (*Id.* at 317.)  "As soon as [Officer Bovell] picked up the weapon, [he] confirmed to Officer Stewart that [he] had the weapon and [that] the party [whom Officer Stewart was in the process of arresting] was the guy who had the weapon," which person was Defendant.  (*Id.* at 318.) Officer Bovell also acknowledged that he was not wearing gloves when he picked up the weapon, but stated that after Defendant was transported back to headquarters, Officer Bovell "placed the weapon back on the ground the same way [he] took it up, and . . . proceeded to take pictures of it."  (*Id.* at 318–19.)  "[T]he pictures [Officer Bovell] took were of the gun in the same position [in which he] observed it before [he] picked it up . . . ."  (*Id.* at 319.)  ADA Nagler then showed Officer Bovell two photographs, which Officer Bovell identified as those pictures. (*Id.* at 319–20.)  Towards the end of his direct testimony, Officer Bovell recounted that he had observed an officer from the emergency-services unit remove 12 live rounds from the gun's magazine.  (*Id.* at 320.)  He also emphasized that at no point from the time that he observed Defendant holding the gun to the time that he observed Defendant drop it was his view ever obstructed.  (*Id.* at 321.)

During her cross-examination and re-cross of Officer Bovell, Ms. Gerardi focused mainly on asking him to recount precisely where he had been and what he had observed during the incident, and to indicate his location at various points in time by marking with a pen the photographs that she showed him.  (*Id.* at 322–41.)  Ms. Gerardi also got Officer Bovell to admit

that he had seen three people besides himself handling the gun before it was put away for safekeeping.  (*Id.* at 342.)

The People's last witness was Detective Arthur Holzman of the Westchester County Department of Public Safety ("Detective Holzman"), a ballistics expert.  (*Id.* at 343–46.)  He testified that on April 29, 2010, he received a firearm from Officer Stewart.  (*Id.* at 347.)  He explained that he then conducted an examination of the gun by taking "two of [the] . . . rounds of ammunition that came with [it], actually load[ing] [them] into [the] firearm[,] and attempt[ing] to fire it."  (*Id.* at 349.)  He had concluded that the "firearm [was] operable."  (*Id.* at 354.)  He also noted that "[i]n a lot of cases, there are not fingerprints found on firearms," "[b]ecause the areas that [a person] touch[es] a firearm or [that a person] commonly manipulate[s] that firearm to fire it, are not smooth . . . .  [T]he best fingerprints are left on smooth, flat surfaces."  (*Id.* at 352.)  The areas of the gun that he had examined that would have been manipulated had "a texture on them," which did "not lend itself well to fingerprints."  (*Id.* at 352–53.)  He also suggested that the gun's magazine and cartridges also would not have "len[t] [themselves] to . . . fingerprint[s] being left" on them.  (*Id.* at 353.)  Detective Holzman testified that the gun was a Smith & Wesson Model 422 semiautomatic, which was referred to as a "semiautomatic or auto loading pistol."  (*Id.* at 350.)

On cross-examination, Detective Holzman confirmed that he was a firearms expert, but not an expert in "fingerprinting" or "DNA."  (*Id.* at 354–55.)  He answered in the affirmative Ms. Gerardi's questions as to whether fingerprints or DNA were "ever" taken from or found on guns.  (*Id.* at 355.)  He also stated that he had appeared 37 times as a ballistics expert at trial, but never for the defense.  (*Id.* at 356.)  Additionally, Ms. Gerardi and Detective Holzman discussed a theme that ran through Ms. Gerardi's cross-examinations of the prosecution's other

10

witnesses—the potentially confusing characterization of the gun as a "long rifle." (*Id.* at 356–57.) Ms. Gerardi asked, "You said that it is called a .22 caliber long rifle . . . . But it is not actually a rifle, is it?" (*Id.* at 356.) Detective Holzman responded, "I think you're confusing things. The pistol is .22 long rifle caliber. The ammunition that's appropriate for that firearm is .22 long rifle. .22 long rifle has nothing to do with the make or model of this firearm," which was a "semiautomatic pistol." (*Id.*) On re-direct, ADA Nagler asked Detective Holzman how many times he had learned of fingerprints being found on a weapon in his 24-year career. (*Id.* at 359.) Detective Holzman said that he "could not give a specific number," but that it was "very infrequently." (*Id.*) In fact, sometimes Detective Holzman "joke[d] around at work that the guys who check for fingerprints almost never find them on firearms." (*Id.*) With the conclusion of Detective Holzman's testimony, the People rested. (*Id.* at 360.)

The defense called a single witness on Defendant's behalf: Toccara Barley ("Ms. Barley"). (*Id.* at 364–65.) Ms. Barley recalled that on February 15, 2010, at approximately four o'clock in the morning, she was at The Calabash, at a party where Defendant was working as the DJ. (*Id.* at 365–66.) She had met up with Defendant at the party; they were there "together." (*Id.* at 366.) Ms. Barley knew Defendant "from parties," but was not "his girlfriend." (*Id.* at 366–67.) At the end of the party, Ms. Barley and Defendant "were leaving [T]he Calabash [with two other people] . . . [and] going out to [Defendant's] car." (*Id.* at 367.) There were "a lot of people outside," because "the club was letting out." (*Id.*) The street was crowded. (*Id.*) As they left, "[t]here was a commotion in the front [of the bar]." (*Id.* at 368.) Ms. Barley was walking approximately five feet behind Defendant, and could see that he was holding "his microphone stand in his right hand and [his] car keys in [his] left [hand]." (*Id.* at 368.) When they arrived at Defendant's car, which was parked not directly in front of the bar but "a couple [of] cars" away,

Defendant "went to go open the trunk of the car, but it was locked.  So he went around to the driver's side.  But before he went around to the driver['"]s side, he put the microphone stand down in the back of the car."  (*Id.* at 368–69.)  At this point in Ms. Barley's testimony, Ms. Gerardi sought to introduce a microphone stand into evidence, and asked Ms. Barley whether it "fairly and accurately depict[ed] the microphone stand that [Defendant] was holding that evening."  (*Id.* at 369.)  Ms. Barley confirmed that it was the "exact same stand" that had been in Defendant's possession.  (*Id.* at 370.)

Ms. Barley then demonstrated for the jury how Defendant had held the microphone stand, which was "down to his side in his right hand."  (*Id.* at 371.)  After doing so, she resumed her narrative, and stated that after Defendant put the microphone stand down in the back of the car, he "walked to the driver's side of the car to open the car, and then he came back to the back of the car."  (*Id.* at 371–72.)  Ms. Gerardi asked, "Where was the microphone stand in relation to the car?"  (*Id.* at 372.)  Ms. Barley responded, "In the back of the car."  (*Id.*)  Ms. Gerardi then asked, "So what happened when he put the microphone stand at the back of the car?"  (*Id.*)  Ms. Barley said, "He put the microphone stand at the back of the car, he walked to the driver's side of the car to open it.  And he came back to the back, he went to go pick up the microphone stand and that's when the police came . . . ."  (*Id.*)[1]

---

[1] For the sake of clarity, before continuing with Ms. Barley's version of events, it is worth highlighting that she initially stated three times that Defendant put the microphone stand down *in* the back of the car.  (*See* State Trial Tr. 369 ("But before he went around to the driver['"]s side, he put the microphone stand down *in* the back of the car." (emphasis added)); *id.* at 371 ("He put the stand down *in* the back of the car." (emphasis added)); *id.* at 372 ("Q: Where was the microphone stand in relation to the car?  A: *In* the back of the car." (emphasis added)).)  However, after these descriptions of the stand's location, Ms. Gerardi asked Ms. Barley what happened when Defendant "put the microphone stand *at* the back of the car," at which point Ms. Barley repeated, "[h]e put the microphone stand *at* the back of the car."  (*Id.* at 372 (emphasis added).)  The difference between *in* and *at* is potentially significant, given the police officers'

Ms. Barley stated that only one officer came out of the first police car to arrive.  (*Id.* at 373.)  She said that the officer "basically just jumped out the car and told [Defendant] to stop and [Defendant] asked why."  (*Id.*)  "[T]he police officer [then] basically told [Defendant] to get against the car and check him . . . ."  (*Id.*)  Ms. Gerardi asked Ms. Barley, "[D]id [the police officer] say to [Defendant] to stop?"  Contradicting the statement that she had made just seconds earlier, when she said that the officer had indeed told Defendant to stop, Ms. Barley said, "No," and also said that the officer "just . . . approach[ed] [Defendant]," and "grabbed him, like, get against the car, like."  (*Id.* at 373–74.)  When asked if there was a struggle, Ms. Barley said, "Somewhat.  Not really, but, yeah."  (*Id.* at 374.)  She then described the arrival of a second police car "a few minutes after the first car came," by which point Defendant was already being put in handcuffs.  (*Id.* at 374–75.)  Ms. Barley also testified that Defendant was wearing a green jacket that night, but that there were other people at The Calabash who were also wearing green jackets.  (*Id.* at 375.)  In fact, "two or three people had the same exact jacket on"—the jacket "was . . . popular."  (*Id.*)  Ms. Barley did not see a gun on the ground until "[a]fter [Defendant] was arrested already,"  and she "[n]ever" saw Defendant throw a gun to the ground, or hold a gun at any point that night.  (*Id.*)

During ADA Nagler's cross-examination, she inquired into Ms. Barley's relationship with Defendant, specifically asking whether they were "friends."  (*Id.* at 376.)  Ms. Barley responded, "As far as partywise, he is a DJ, so yeah; but other than that, no."  (*Id.*)  Ms. Barley

---

testimony.  If Defendant put the microphone stand down *at* the back of the car, this could have been an alternative explanation of the officers' description of Defendant dropping what they claimed was a gun into a snowbank.  (*See id.* at 187, 312, 315–17, 321.)  Testimony that Defendant put the microphone stand down *in* the back of the car would have been much less helpful to the defense.

said that she saw Defendant at "a lot of parties" at which he worked as the DJ.  (*Id.* at 377.)

Again contradicting something that she had just said, when ADA Nagler asked Ms. Barley for a

second time whether Defendant was "a friend of [hers]," Ms. Barley said, "Not a friend, but an

associate, you can say."  (*Id.*)  In response to further questioning, Ms. Barley said that she did

not know where Defendant lived; that she was not aware that he lived only ".38 miles," or

approximately "five blocks," "from [her] house in the Bronx"; that she did not know him from

the neighborhood; and that, again, she was not friends with him.  (*Id.*)  She also said that she

went to the precinct to find out "what was going on with [Defendant]" after his arrest.  (*Id.* at

378–79.)  ADA Nagler asked, "Did you tell them at the police station, [']You got the wrong guy,

why is he here, why has he been arrested?'"  (*Id.* at 379.)  Ms. Barley responded, "Yes, and we

still got no answer."  (*Id.*)  Ms. Barley then said that the police "would not take a statement from

[her]," and that she never went "back to [the police to] tell them, [']What is going on, why has

he been arrested?'"  (*Id.*)  She did not go to court the next morning, nor did she "ever go to the

District Attorney's Office [to] tell them that [she] had this information," or ever go to the police

or the press to inform them that Defendant should not have been arrested.  (*Id.* at 380.)

ADA Nagler then attempted to impeach Ms. Barley based on her own past misconduct,

first getting her to admit that she was "involved in an incident for which [she] pled guilty to

harassment in the Bronx."  (*Id.* at 381.)  Ms. Barley said that "[i]t was a misdemeanor" that

"[g]ot thrown out, actually."  (*Id.* at 381.)  ADA Nagler said, "Well, actually, it did not get

thrown out, you pled to the violation of harassment; is that right?"  (*Id.*)  Ms. Barley said, "Yes."

(*Id.*)  ADA Nagler then asked, "And also in that case you were directed to come back to court,

but you did not come back to court and a warrant was issued for your arrest; isn't that true?"

(*Id.*)  Ms. Barley responded, "I actually went to all of my court dates.  I never had a bench

14

warrant." (*Id.* at 382.)  ADA Nagler persisted, but Ms. Barley held firm, emphasizing that she

"always made [her] court dates." (*Id.*)  Continuing with the attempted impeachment, ADA

Nagler established that Ms. Barley had been working at a grocery store in Mount Vernon for "a

year and a couple months," and that she was paid for her work "on the books," before asking Ms.

Barley, "But, in fact, . . . aren't you currently claiming unemployment benefits with the

Department of Social Services?" (*Id.*)  Ms. Barley said, "Actually, no, I am not." (*Id.*)  ADA

Nagler pressed the point, but Ms. Barley held firm again, stating three more times that she was

not claiming unemployment benefits of any kind.  (*Id.* at 382–83.)  ADA Nagler then had Ms.

Barley repeat details of her direct testimony with the assistance of photographs that she showed

to her, after which ADA Nagler returned to the subject of Ms. Barley's relationship with

Defendant.  (*Id.* at 383–87.)  Ms. Barley said that she had known Defendant for "a couple

months, maybe a year.  Not that long." (*Id.* at 387.)  Ms. Barley also stated that she had never

"seen [Defendant] outside of his being a DJ," and that she did not know any of his family

members.  (*Id.* at 387–88.)

       Possibly picking up on one of the apparent inconsistencies in Ms. Barley's testimony,

ADA Nagler then asked, "So when [Defendant] walked up to the car, it is your testimony that

you were on the sidewalk and you saw [Defendant] put [the microphone stand] into the car?"

(*Id.* at 388.)  Ms. Barley said, "No. . . .  It was sitting on the floor behind the car." (*Id.*)  ADA

Nagler asked, "On the street?" (*Id.*)  Ms. Barley responded, "Yes.  On the street, behind the car.

Because he had to go around and open the door, so he sat it down . . . .  After he opened the door,

he came back around to open the trunk . . . .  He went to go pick it up, and that's when the police

came." (*Id.*)  Ms. Barley confirmed that the microphone stand "was . . . still on the street" when

the police arrived.  (*Id.*)  Ms. Barley also recounted that Defendant had said that he did not know

"what [the officer was] arresting him for," (*id.* at 390); "asked [the officer] why he was being arrested," (*id.*); and "turned back around, like, Why?  Asked Why," (*id.* at 391).  Near the end of her cross-examination, ADA Nagler questioned Ms. Barley about her relationship with Defendant yet again.  (*Id.* at 404.)  Specifically, ADA Nagler asked if Defendant knew Ms. Barley's phone number, to which Ms. Barley responded affirmatively.  (*Id.*)  ADA Nagler then asked if that meant that Ms. Barley was "friends with [Defendant]," but Ms. Barley said, "Not friends.  As DJ, or I'm throwing a party, come to the party.  That's about it.  Not friends." (*Id.*) Ms. Barley also said that Defendant had never been to her home, and that she had never been to his.  (*Id.*)  After this testimony, the defense rested.  (*Id.* at 408.)

The People then called Officer Stewart as a rebuttal witness.  (*Id.* at 408.)  Showing Officer Stewart the microphone stand that the defense had introduced into evidence, ADA Nagler asked if Officer Stewart had ever seen it before.  (*Id.* at 409.)  He said, "No, I have not." (*Id.*)  He also said that it was not "possible that the object that [he saw Defendant] holding . . . prior to [Officer Stewart] apprehending him" was the microphone stand.  (*Id.* at 409.)

Ms. Gerardi began her summation by claiming that Defendant was "the wrong man." (*Id.* at 437.)  Ms. Gerardi said that "[the People's] case [was] full of reasonable doubts, and [that she] intend[ed] to show [the jury] what they [were]." (*Id.*)  She claimed that there was "no physical evidence"—"no fingerprint evidence" and "no DNA evidence." (*Id.*)  According to Ms. Gerardi, "[f]ingerprint evidence would have told [the jury] right away who was really holding that gun . . . [,] [b]ut the Mount Vernon Police Department failed to preserve the integrity of that gun when they handled it." (*Id.* at 437–8.)  Ms. Gerardi then went into detail about the number of people who touched the gun before it was secured, and the manner in which they did so.  (*Id.* at 438–39.)  She made a similar case for the lack of DNA evidence.  (*Id.* at 439–40.)

16

Additionally, she said that "[t]here was also another failure . . . in this particular case, [which] was [the failure] to investigate any possible witnesses." (*Id.* at 440.) "[T]he evidence [was] that there were 60 to 80 people [who] were standing in front of [T]he Calabash when [Officers Stewart, Byrwa, and Bovell] came to the scene," but there was "no evidence whatsoever that any investigation of any of those people in front of that location ever took place." (*Id.* at 440.) Instead of asking "anybody any questions," the police had "just acted on what somebody in the street said and then went and got that person, arrested him, and that was it." (*Id.*)

Ms. Gerardi spent most of her remaining time attacking the testimony of Officers Stewart, Bovell, and Byrwa, claiming that Officer Stewart's and Officer Bovell's testimony was "unreliable, untrustworthy, contradictory and full of mistakes." (*Id.* at 441.) In particular, she emphasized the apparent inconsistencies between the officers' testimony and what they had written down in their police reports, specifically in relation to the description of the type of gun that Defendant had allegedly dropped, Defendant's build, and the number of suspects that the police originally thought might have committed the offense. (*Id.* at 443–45.) For example, she stated that Officer Stewart "wrote down the word 'rifle' . . . [f]our times in a felony complaint that he signed when, in fact, the object that was alleged to have been held in [Defendant's] hand was a handgun." (*Id.* at 445.) She also underscored what she believed to be tension between Officer Bovell's and Officer Byrwa's testimony. (*Id.* at 446.) Additionally, she argued that the serial number for the gun that Officer Stewart wrote down on an evidence receipt was "a different serial number from the serial number that Detective Holzman testified to." (*Id.* at 444.) Lastly, she spent a comparatively short amount of time describing Ms. Barley's alternative version of what happened and attempting to undermine ADA Nagler's efforts to discredit Ms. Barley, stating that "if [it] were actually true" that Ms. Barley was "collecting unemployment

benefits at the same time that she was working," "that evidence would be before [the jury]." (*Id.* at 447–48.) After defending Ms. Barley's decision not to go to court the day after Defendant's arrest, Ms. Gerardi said, "I think the bigger issue and the more important question is, is there any evidence in the record that the police did their job in questioning witnesses?" (*Id.* at 448–49.) "[I]n conclusion," Ms. Gerardi said that "there is no DNA evidence, there is no fingerprint evidence, there is no investigation of witnesses, there is just contradictions and inconsistencies. And the end result here . . . is that the Mount Vernon Police Department arrested the wrong man, an innocent man.  And there can only be one right verdict for the wrong man, and that is a verdict of not guilty." (*Id.* at 449.)

ADA Nagler's summation need not be described in depth.  As she put it, "[Defendant] had the gun, [the police] saw him with the gun, and he was arrested.  There [was] no other reason for [Defendant] to have been arrested.  There were a number of people out there.  If [the police] did not see the gun in [Defendant's] hand, he would not have been arrested.  And it is that straightforward and it is that simple." (*Id.* at 450.)  Responding to Ms. Gerardi's emphasis on apparent weaknesses in the People's case, ADA Nagler spent little time discussing Ms. Barley and her testimony. (*Id.* at 449–63.)

After the conclusion of ADA Nagler's summation, the court instructed the jury "with respect to the law and [its] deliberations." (*Id.* at 463.)  By mutual agreement of the prosecution and defense, in the end the court did not end up including in its jury charge criminal possession of a weapon in the third degree, as the defense's case did not turn whatsoever on whether the gun was loaded at the time Defendant allegedly possessed it. (*Id.* at 430–31.)  As a result, the court's jury charge included only two offenses: criminal possession of a weapon in the second degree

18

and resisting arrest.  (*Id.* at 431, 475–479.)  At the conclusion of the court's jury instructions and related remarks, the jury was excused and began deliberating.  (*Id.* at 487.)

During its deliberations, the jury sent the court several notes, in which it asked to review eight different types of evidence, including "Info from witness about mic stand—was evidence the stand at scene," "Defense attorney testimony when the mic stand was put in evidence," and "'DEF,' which [the court took] as Defense, 'witness regarding mic stand.'"  (*Id.* at 490, 494–95.) The jury also asked for "'chart on parking at scene, large chart also DEF,' which [the court took was] Defendant's, 'chart on street'"; "attorney testimony about conflicting serial number on weapon and report;" "Officers Byrwa and Bovell's testimony on arrival at the scene"; and "Officer Stewart's statement on when other officers arrived," in addition to requesting to see "evidence, Exhibit Number 26," and "expert's report on Exhibit Number 26."  (*Id.* at 490, 495.) The jury's requests regarding Exhibit 26 related to "the gun, . . . ammunition[,] and magazine," which the court "[gave the jury] an opportunity to see."  (*Id.* at 495.)  The court was unable to supply the jury with any expert's report on the gun, ammunition, and magazine, as no such report was entered into evidence.  (*Id.* at 495.)  The jury later requested to review Officer Stewart's police report, which request the court denied, as that report was also not in evidence. (*Id.* at 509.)  The jury also later asked to review all of Officer Bovell's testimony, which request the court granted.  (*Id.* at 522.)

The jury eventually found Defendant not guilty as to the first count, criminal possession of a weapon in the second degree, but guilty as to the second count, resisting arrest.  (*Id.* at 525–26.)

### 2.  Defendant's Federal Trial

On November 8, 2011, after Defendant was acquitted on the state gun-possession charge, a federal grand jury returned an indictment charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  (*See* Dkt. No. 5; Def.'s Mem. 5.)  This Court presided over Defendant's federal trial, which began on June 19, 2012.  (Federal Trial Tr. 27.) Just as had ADA Nagler, Assistant United States Attorney Rebecca Mermelstein ("AUSA Mermelstein") called Officers Stewart, Byrwa, and Bovell in support of the Government's case. The testimony that the arresting officers gave at the federal trial need not be described in depth, as it substantially mirrored the testimony that they gave in state court, except in several key respects that the Court will discuss shortly.  But beyond calling these three officers, AUSA Mermelstein's trial strategy differed significantly from ADA Nagler's, as became clear from the outset of her opening statement:

> So let's talk a little bit about what happened.  It was February 15th of 2010.  It was about four o'clock in the morning.  And the defendant was walking on a street outside a night club in Mount Vernon, New York.  The owner of the night club was standing inside the doorway, and he was watching as patrons left for the night . . . . And as the owner looked down the street, just a few car lengths away from where he was standing, he saw a man emerge from between two parked cars.  The man was wearing a green hooded jacket.  And in his hand, in his right hand, he was holding a gun.  It was a .22 caliber, Smith & Wesson, semiautomatic, long-barrel handgun. And it was loaded with twelve rounds of ammunition.  So the club owner went back into the club.  He closed the door, and he went to call the police.  But as it turns out, the police were already in the area.

(*Id.* at 15–16.)

The club owner in question was Errol McKenzie ("Mr. McKenzie"), whom AUSA Mermelstein called as her fourth witness.  (*Id.* at 173.)  Mr. McKenzie testified that he owned a business that was known at the time Defendant's arrest took place as "The Calabash nightclub[]

[and] restaurant." (*Id.* at 174.)[2]  From the night of February 14, 2010 through the early morning

of February 15, 2010, Mr. McKenzie was working at The Calabash, as "there was a party there."

(*Id.* at 175.)  The theme of the party was "R&B oldies," and the party's promoter, whom Mr.

McKenzie had hired, had in turn hired a DJ to provide the music.  (*Id.* at 175–76.)  Before that

night, Mr. McKenzie had "never met the DJ."  (*Id.* at 176.)  Sometime between 3:25 a.m. and

3:30 a.m., Mr. McKenzie "observed . . . three or four ladies.  They were like arguing and starting

to . . . gesticulat[e] on the dance floor[,] . . . shouting out in the direction of the DJ."  (*Id.*)  Mr.

McKenzie "instructed the bartenders to . . . turn the lights up[,] . . . and . . . instructed [a member

of his security personnel] to have [the ladies] ejected."  (*Id.*)  After they were removed and Mr.

McKenzie "saw them . . . go through the exit, [he] went and [he] stood at the exit . . . observing

them leaving."  (*Id.* at 177.)  From his vantage point, he was able to see the street outside, which

was "reasonably bright because . . . there were no leaves on the trees and there were

approximately three streetlights."  (*Id.* at 177.)  After two-to-three minutes "standing there," two

different "ladies" began "standing by the door in front of [him]."  (*Id.* at 178.)  "[T]hey were

waiting on somebody to come and get them."  (*Id.*)  At that point, Mr. McKenzie "observed to

[his] right, approximately 50 feet to 55 feet [away], an individual come between from behind a

Ford Explorer and a . . . parked car."  (*Id.*)

    This individual "looked like a male," "wearing a . . . green hooded jacket," and "looked

to be about [six-feet or six-feet-one-inch tall], weighing approximately 200[] [or] 220 pounds."

(*Id.*)  "As soon as [the individual] came between the vehicles and stepped on the sidewalk, he

---

[2] At some point between February 15, 2010, when Defendant was arrested, and June 19,
2012, when Defendant's federal trial began, the name of Mr. McKenzie's business changed from
"The Calabash" to "Little Ochie Bar & Grill."  (Federal Trial Tr. 174.)

turned towards . . . The Calabash," and Mr. McKenzie "observed a weapon in his right hand."
(*Id.*)  When AUSA Mermelstein asked Mr. McKenzie what kind of weapon it was, Mr.
McKenzie said that it "appeared to [him] to be a [.]22 long rifle target pistol."  (*Id.*)  AUSA
Mermelstein asked him how he could "know with such specificity what kind of gun it was?"
(*Id.*)  Mr. McKenzie replied that it was "by [his] experience in weapon recognition.  [He] served
for two years as the regiment weapons officer for [his Jamaica Defense Force] army unit."  (*Id.*
at 178–79.)  He described his role as a regimental weapons officer as "maintaining weapons
efficiency in small arms among the troops," and confirmed that he "in particular use[d] or
traine[d] [w]ith the .22 caliber long barrel handgun."  (*Id.* at 179.)  He also explained that this
weapon was called a "long rifle" because of the "[t]ype of ammunition used."  (*Id.* at 179.)

"The moment" that "[the] man in the green jacket" "turned towards the club and [Mr.
McKenzie] recognized the weapon, [he] had a decision to make[:] evade or defend.  [He] could
only evade at that point," which he did by "[r]un[ning] for cover."  (*Id.* at 179–80.)  He "pull[ed]
the two ladies that were in front of [him] . . . in," and "shut the door."  (*Id.* at 180.)  He then
"instructed [his] security people [to] shut the other door, the entrance, because there[] [was]
somebody approaching with a weapon."  (*Id.*)  He had the two ladies "stay back in the dark
because there[] [was] a window in front which [was] open."  (*Id.*)  Mr. McKenzie "then jumped
on [his] telephone to speed dial the . . . Mount Vernon Police, at which point [he] saw flashing
lights . . . from . . . a police car."  (*Id.*)  He had an "opportunity to observe if the police arrested
anyone that night," as "the moment [he] realize[d] [that the police] were outside, [he] opened the
door[] [and] went outside.  [He] saw . . . two or three police officer[s] present on the sidewalk."
(*Id.* at 180–81.)  He also saw "a police car surrounded . . . with some police officers.  And in the
middle of the group, being put into the car was an individual," who "was wearing . . . what

22

appeared to be the same green hooded jacket." (*Id.* at 180.)  Later, he "got a better look at the person who had been placed under arrest," "[w]hen the car moved off from the loading point . . . [and] slowed down on passing the club." (*Id.* at 181.)  Mr. McKenzie "looked in the back and . . . got a closer look at the jacket.  [It] seemed to be the same jacket that [he] saw, the person wearing it." (*Id.*)  "The person was actually slumped over, and [Mr. McKenzie] just observed the shoulders of the jacket with the hood . . . .  [It was] . . . similar [to the] jacket [that he] saw the person with the weapon walking towards the club in." (*Id.* at 182.)  When AUSA Mermelstein asked if Mr. McKenzie "would . . . say that it was similar or . . . that it was the same," he said, "Similar and same is the same word in English." (*Id.* at 182.)

Mr. McKenzie then identified a Government exhibit as a photograph of the front of the premises of The Calabash, and indicated with a laser pointer where he had been standing and where the man in the green jacket had been standing when he saw him.  (*Id.* at 182–83.)  He also explained that there were three lights on the sides of nearby buildings, as well as three streetlights in the area.  (*Id.* at 184.)  Mr. McKenzie also indicated where he saw the man in the green jacket being put into the police car.  (*Id.* at 185.)  "From the time when [Mr. McKenzie] first started watching patrons leaving that evening until [he] saw the man in the green jacket driving away in a police car," Mr. McKenzie never saw "anyone other than that person wearing that green jacket." (*Id.* at 186.)

Defendant's federal-trial counsel, Susanne Brody ("Ms. Brody"), cross-examined Mr. McKenzie.  (*Id.*)  She first asked Mr. McKenzie if he could identify an invitation to the party at The Calabash and a photograph of the DJ booth at The Calabash on the night in question, which he could.  (*Id.* at 186–88.)  Ms. Brody then asked Mr. McKenzie if he had visited the police station after the arrest, which Mr. McKenzie said that he had—in fact, he "hand[-]wrote a

23

statement" for the police, and "[met] with them . . . several [additional] times after." (*Id.* at 188–89.) Ms. Brody also asked a series of general questions about The Calabash's operations, such as how many bartenders and security guards had been working on the night of the party, what role the security guards played, and who hired the security guards. (*Id.* at 189–90.) Mr. McKenzie also testified that he did not know when Defendant arrived at The Calabash that evening; that Defendant was already there when he arrived; that he did not see Defendant enter the club with any equipment; and that he did not recall Defendant visiting the bar, where Mr. McKenzie was working, at any point that night. (*Id.* at 190–92.) Ms. Brody also asked Mr. McKenzie a series of questions on topics ranging from whether the club's kitchen was open on February 14, 2010, to how many windows there were on the DJ booth. (*Id.* at 192–94.)

Notably, Ms. Brody further questioned Mr. McKenzie about a security camera focused on the entrance to the club. (*Id.* at 197.) Mr. McKenzie said that the purpose of the camera was "[t]o record people entering and leaving through the entrance," but that its range was limited, and that it was not put in place "to see what's happening on the street." (*Id.* at 197.) The Calabash maintained cameras "inside as well." (*Id.* at 198.) Images for all of the cameras were "recorded on a hard drive," which stored the recordings "for approximately 30 days before it . . . record[ed] over" them. (*Id.*) Mr. McKenzie stated that "on various occasions," police officers had viewed his security-camera videotapes, but that to the best of his knowledge, no officer had reviewed the videotapes for the night of the incident. (*Id.* at 198–201.) However, "two officers" at the Mount Vernon Police Department "[had] access" to the videotapes, "[e]ven [when Mr. McKenzie was] not at the club," and "could have gone on, sign[ed] themselves on and check[ed] it out." (*Id.* at 200–01.)

24

Ms. Brody also elicited from Mr. McKenzie an admission that the man with the green hooded jacket that he had seen carrying a gun had pulled the jacket's hood over his head, such that his face was obscured.  (*Id.* at 201–02.)  As a result, Mr. McKenzie "had no opportunity to observe his face," especially because he was "focused on the gun."  (*Id.* at 202.)  He "couldn't actually . . . see inside that hood because [there was] low light inside [the hood]."  (*Id.*)  He did not recall ever seeing the jacket inside his club at any time that night, and never said to any of the police officers that the man whom he had seen being arrested was his DJ.  (*Id.*)

On re-direct, Mr. McKenzie suggested that most people were not wearing their winter coats inside the club.  (*Id.* at 203.)  He also stated that at no point during the night did he see either of the two Mount Vernon police officers "who knew about the video surveillance."  (*Id.* at 204.)  Despite not being able to see into the hood of jacket, Mr. McKenzie did state that "[b]y quick recognition, [he] would say [that the man in the green jacket] was Afro-American," "[b]ecause . . . the hand holding the weapon was clearly visible," and if the suspect had been "Caucasian, [he] would [have been] able to tell . . . ."  (*Id.* at 205.)  At the end of re-direct examination, Mr. McKenzie suggested that his video-surveillance camera would not have captured the area of the street in which he observed the man in the green jacket carrying the gun.  (*Id.* at 205–06.)

As noted above, before calling Mr. McKenzie, AUSA Mermelstein had called Officers Stewart, Byrwa, and Bovell, who gave testimony almost identical to that which they gave at Defendant's state trial.  (*See* Def.'s Mem. 5 ("At his federal trial, all three officers . . . testified essentially the same as they did at the State trial; that [Defendant] was apprehended outside of the nightclub after Officer Stewart and Officer Bovell saw him with a gun in his right hand.").)  However, given the importance of Officer Stewart's testimony at Defendant's state and federal

trials, one distinction between the testimony he gave at each proceeding deserves mention.  At Defendant's state trial, ADA Nagler finished her direct examination of Officer Stewart without asking any questions designed to elicit from Officer Stewart that there were possible inconsistencies between his recollection of the night's events and what had been recorded about those events in the police report that Officer Stewart filled out and the evidence-property invoice that he signed.  In fact, it was not until Ms. Gerardi asked Officer Stewart about the report and the invoice that the jury heard about these documents, much less any inconsistencies contained therein.

However, AUSA Mermelstein took a different tack at Defendant's federal trial.  During her direct examination of Officer Stewart, AUSA Mermelstein asked him whether he had "fill[ed] out any paperwork" in connection with Defendant's arrest.  (Federal Trial Tr. 47.) Officer Stewart said that he had "filled out a police report, the evidence receipt for the firearm, and also a few other paperwork."  (*Id.*)  He said that he had filled out this paperwork "[t]he same night of the arrest," which meant that he had started filling it out at "about 5:30 AM, that morning."  (*Id.* at 48.)  He also said that he had reviewed his report prior to testifying.  (*Id.*) AUSA Mermelstein then asked him whether the report was "correct and accurate," to which Officer Stewart responded, "For the most part, yes."  (*Id.*)  When AUSA Mermelstein asked "[w]hat about it [was] not accurate," Officer Stewart responded as follows:

> There [were] some typographical errors on it.  There's a box on the report that says ["]number of suspects.["]  I listed ["]two["] when it should only have been ["]one.["] Also, I did make a mistake in writing [Defendant's] address.  I put that he lived in Mount Vernon, and I subsequently was able to correct that by hand that he lived in the Bronx.  And also his build that night, his build, his body size that night.  I checked small when it should have been medium . . . .  There's about, if I remember,

maybe about a hundred and some odd different boxes on that report that has to be checked off, and it's just some typographical mistake . . . .

(*Id.*)

Anticipating the potentially confusing issue of the gun's nomenclature in light of the type of ammunition it uses, AUSA Mermelstein fronted this subject as well, in her direct examination of Mr. McKenzie, as described above.  (*See id.* at 178–79.)  The only other aspect of the Government's case that bears mention for present purposes is that the Government did not call Detective Holzman or any other ballistics expert.

As for the defense's case, shortly before the Government called Mr. McKenzie, Ms. Brody represented to the Court that she was planning to call as many as four witnesses, one of whom was Ms. Barley.  (*Id.* at 172.)  But when it came time for Ms. Brody to call Ms. Barley, in an exchange at the heart of the instant Motion, Ms. Brody told the Court that the defense team had "not been able to track down Ms. Barley for the past five days," and that she had "sent people to her house" and had "subpoenaed her," but that she did not "have the power of the government to get people" to trial to testify.  (*Id.* at 235.)  In the end, Ms. Brody did not call any witnesses on Defendant's behalf.  On June 20, 2012, the jury returned a verdict of guilty, convicting Defendant of the one charge.  (*See* Dkt. (minute entry for June 20, 2012).)

B.  Procedural Background

On June 22, 2012, the Court issued a Scheduling Order, permitting Defendant to file motions under Rules 29 and 33 of the Federal Rules of Criminal Procedure by July 31, 2012.  (*See* Dkt. No. 17.)  On July 27, 2012, Defendant requested an extension of that deadline, which the Court granted.  (*See* Dkt. No. 20.)  On August 26, 2012, Defendant wrote in a letter to the Court that, "[d]ue to a severe communication and ineffective problems with [his] Attorney

Susanne Brody," he "want[ed] to file under Rule 33 ineffect [sic] claim to this Court now which w[ould] show that it would have made a different out come [sic] at [his] trial." (Dkt. No. 22.) Following a hearing on the subject, the Court granted Defendant's request, replacing Ms. Brody with Andrew G. Patel ("Mr. Patel") on September 7, 2012. (*See* Dkt. (minute entry for Sept. 7, 2012).)

Now represented by Mr. Patel, Defendant filed the instant Rule 33 Motion. (Dkt. No. 24.) He claims that "[t]he representation [that he] received at his federal trial fell below the level of an objectively reasonable standard of representation because Ms. Brody failed to take steps that reasonable defense attorneys routinely take in representing their clients." (Def.'s Mem. 8–9.) Specifically, Ms. Brody "neither made a request for a Material Witness Warrant [for Ms. Barley], nor asked for a continuance in an effort to locate [Ms. Barley,] a key exculpatory witness . . . ." (*Id.* at 10.) Additionally, "Ms. Brody failed to effectively represent [Defendant] when she did not move to admit Ms. Barley's state trial testimony as prior testimony of an unavailable witness" under Rule 804(b)(1) of the Federal Rules of Evidence. (*Id.*) Defendant asserts that he "is in the unique position of having proof" that these failures "prejudice[d]" him, as "[t]he failure to present a defense at his federal trial is the principal difference between his federal and state trials," the latter at which he was acquitted. (*Id.* at 12.)

Prior to the Government's response, Glenn Almas ("Mr. Almas"), an investigator with the Federal Defenders of New York, submitted a sworn statement in which he recounted his efforts on behalf of Ms. Brody to secure Ms. Barley's attendance at Defendant's federal trial. (*See* Aff. of Glenn Almas ("Almas Aff.") (Dkt. No. 31).) He stated that in early May 2012, he "went to the last known address of Ms. Toccara Barley in the Bronx," but as no one was home, he left his Federal Defender business card. (*Id.* ¶ 3.) Ms. Barley's sister called Mr. Almas soon

28

thereafter, informing him that Ms. Barley would be calling him back.  (*Id.* ¶ 4.)  Ms. Barley

"subsequently called [Mr. Almas's] office," at which point he "informed her that [Defendant's

defense team] wanted to call her as a witness at [Defendant's] upcoming trial."  (*Id.* ¶ 5.)  Ms.

Barley "stated that this would be no problem as she had testified previously at the state trial."

(*Id.*)  When Mr. Almas followed up on May 11, 2012, Ms. Barley "indicated that she had moved

to Virginia and gave [Defendant's defense team] her new address," which she gave as

"Apartment M" in a building in Henrico, Virginia.  (*Id.* ¶¶ 6–7.)  Mr. Almas sent a subpoena to

her new address that same day, but learned on May 15, 2012 that she had not received it.  (*Id.* ¶¶

7–8.)  As it turned out, Ms. Barley actually lived at "Apartment U," not "Apartment M," in the

same Henrico building.  (*Id.* ¶ 8.)  Mr. Almas then called his "counterparts in the Virginia

Federal Defenders to confirm that [Ms. Barley] lived at [Apartment U]," which counterparts then

"sent an investigator to [Ms. Barley's] home and confirmed that she lived at the given address."

(*Id.* ¶ 9.)  Once Mr. Almas received this confirmation, he sent a second subpoena to Ms. Barley's

correct address "overnight by Federal Express," as well as a third subpoena to her previous

Bronx address, where her sister apparently still lived, for which her sister signed upon its arrival

on June 5, 2012.  (*Id.* ¶¶ 10–11.)  When Defendant's trial date was adjourned to the date on

which it eventually took place, Mr. Almas "called [Ms. Barley] to inform her of the new date

and to inquire if she needed assistance with her transportation to New York or a hotel during the

pendency of the trial."  (*Id.* ¶ 12.)  Ms. Barley informed Mr. Almas that "she would be staying

with her sister . . . and did not need any assistance and that she would attend the trial."  (*Id.* ¶

13.)

      The Government responded to Defendant's Motion.  (*See* Gov't Mem. of Law in Opp.

to Def.'s Mot. for a New Trial ("Gov't Mem.") (Dkt. No. 33).)  The Government argues that

Defendant was not denied the effective assistance of counsel, as Ms. Brody's "decision not to seek a material witness warrant [for Ms. Barley] was a reasonable strategic decision"; "Ms. Barley's prior testimony [would not have been] admissible under Federal Rule of Evidence 804(b)(1)"; and that regardless, Defendant "was not prejudiced by [Ms. Brody's] decision not to seek a material witness warrant for Ms. Barley because Ms. Barley would have been subject to damaging impeachment on cross-examination." (*Id.* at 7–21.)

The Court subsequently directed Ms. Brody "to submit a sworn declaration explaining the statement she made during trial with respect to [Ms. Barley]." (Dkt. No. 35.) The Court was referencing Ms. Brody's statements that she had "not been able to track down Ms. Barley for the past five days," that she had "sent people to her house," and that she had "subpoenaed her," but that she did not "have the power of the Government to get people here." (Federal Trial Tr. 235.) Ms. Brody complied with the Court's order, submitting an affirmation in which she stated that she was "fully aware of the Court's power to issue an Order for the arrest of a material witness, (18 U.S.C. § 3144) and [had] stood at hundreds of Rule 11 pleas wherein the court(s) [had] so informed [her] clients that they [had] the right to '. . . . compel the attendance of witnesses,'" citing Rules 11(b)(1)(E) and 17 of the Federal Rules of Criminal Procedure. (Aff. of Susanne Brody, Esq. ("Brody Aff.") ¶ 3 (fifth alteration in original) (Dkt. No. 36).) She was "further aware of the Court's power to hold a witness in contempt who fails to appear and the Court's power to detain a material witness." (*Id.* ¶ 4.) However, Ms. Brody also stated that "[t]he government has the power to send agents to talk to defense witnesses, to telephone defense witnesses, and in some instances to intentionally, or otherwise intimidate, defense witnesses." (*Id.* ¶ 5.) She also noted that Ms. Barley had "informed [her] that an agent had spoken to her and had not initially identified himself as a 'government' agent and that [Ms. Barley] had thought, at

first, he was working with the defense team." (*Id.* ¶ 6.)  She then turned to her decision to not

seek a material-witness warrant to secure Ms. Barley's attendance at trial as a witness on behalf

of Defendant:

> When my office spoke to Ms. Barley she represented that she was a willing witness
> for the defense.  As such we made numerous attempts to serve her with a subpoena,
> which we eventually did . . . .  When we subpoena a witness we can not give them
> immunity as the government can, nor do we have the ability to suggest that they
> could be charged with any criminal conduct.  Nor would it be prudent to suggest to
> a witness we were calling that they should be assigned counsel as the government
> often does.  Simply put, we have the power through the Court, to have them
> produced and no more.  When a defense witness, with whom we have spoken
> chooses not to appear, after they confirmed their appearance, we have to make a
> tactical trial decision.  Do we want someone on the stand who does not want to
> testify?  The next question is, if a Federal Marshal were to arrest them on a Material
> Witness Order would their testimony be favorable?  These are tactical decisions
> which are made during the trial.  In the case of Ms. Barley it was decided that it
> would be prudent to proceed without her.

(*Id.* ¶¶ 7, 9–13.)

Following Ms. Brody's submission of this affirmation, the Court held an evidentiary

hearing on Defendant's Motion.  (*See* Dkt. No. 37.)  Ms. Brody was the only witness called by

either side.  (Hr'g Tr. 2.)  On direct examination, Ms. Brody described the content of

conversations that she claims to have had with Ms. Gerardi about Ms. Barley's state-trial

testimony:

> My understanding, in talking to Ms. Gerardi, was that Ms. Barley's testimony was
> of no moment; that [Ms. Gerardi], in talking to jurors—my understanding from my
> discussion with [Ms. Gerardi] is that Ms. Barley was not either an essential witness
> or a material witness.  And it was my understanding that she wasn't a significant
> component . . . .  My understanding, based on discussions with Ms. Gerardi, was that
> the jury did not believe the cops, and that the acquittal was based on their not
> believing the cops.

(*Id.* at 5–6.)

Ms. Brody also stated that she had originally attempted to contact Ms. Barley before trial because she "knew, from the prior trial and from discussions with [Defendant], that there was a belief that it was important, that she was material, and [Defendant] wanted her at trial." (*Id.* at 6.) She then explained Mr. Almas's efforts to serve Ms. Barley with a subpoena, described above in relation to Mr. Almas's affirmation. (*Id.* at 6–7.) Elaborating on the reference that Ms. Brody made in her affirmation regarding Ms. Barley's claim that a government agent spoke to her, but had not initially identified himself as such, leading Ms. Barley to at first think that the agent was working with the defense team, Ms. Brody said that she "believe[d] [Ms. Barley] said [that the agent] lied to her." (*Id.* at 8.) However, Ms. Brody also confirmed that Ms. Barley did not tell her that the agent had "threatened her in any way" or "yelled at her," and that even after her discussion with the agent, Ms. Barley had still been "willing to testify on behalf of the defense." (*Id.*)

Ms. Brody testified that she had informed the Government that she intended to call Ms. Barley as a witness, and that Ms. Barley had been on her witness list. (*Id.* at 9.) She also testified that she had conversations with AUSA Mermelstein about her intended cross-examination of Ms. Barley, and that the nature of those conversations was that AUSA Mermelstein "had information, and . . . [was] going to cross-examine her." (*Id.*) Ms. Brody did not "remember if [AUSA Mermelstein had] used the word 'perjury,'" but what Ms. Brody took from her conversations with AUSA Mermelstein was that AUSA Mermelstein "believed that [Ms. Barley] had perjured herself at the state trial about her relationship with [Defendant], because in the state trial . . . she said something like she hardly knew him, or she knew him a little bit," but the Government "had information from her cell phone records that there were a lot of calls back and forth, and she knew him a lot better than she had indicated when she was on the

32

stand."  (*Id.* at 9–10.)  Ms. Brody also did not remember if AUSA Mermelstein's words were

that she was going to "rip [Ms. Barley's] heart out," but that was the "kind of the feeling that

[Ms. Brody] got, that [AUSA Mermelstein was] going to totally discredit [Ms. Barley] as a

witness."  (*Id.* at 10 (internal quotation marks omitted).)

Ms. Brody further testified that, had Ms. Barley appeared at trial pursuant to the

subpoena that Ms. Brody's office served, she did not know whether she would have ultimately

called her to the stand.  (*Id.* at 11.)  "There is a lot that goes into . . . a decision to put somebody

on the stand."  (*Id.*)  It was Ms. Brody's belief "that the cops lied, [and] that [Mr. McKenzie]

changed his testimony and he lied," and "based on [her] discussions with [Ms. Gerardi]

previously," and "based on the cops' testimony," Ms. Brody and her co-counsel, Gerard

Thompson-Hicks ("Mr. Thompson-Hicks"), "made a trial decision."  (*Id.*)  Before determining

whether she would have called Ms. Barley had she appeared, Ms. Brody "would have had to

speak to her first to make sure that [everyone was] on the same page."  (*Id.*)

When Ms. Barley did not appear for trial, Ms. Brody understood that her options,

"obviously, were to get a 'material witness' subpoena."  (*Id.*)  Under that procedure, "[t]he

marshals would go, essentially, and arrest her and bring her into court."  (*Id.* at 12.)  But that

would not have forced Ms. Barley to meet with Ms. Brody before trial.  (*Id.*)  Ms. Brody did not

end up seeking a material-witness warrant, because she did not want "a witness who could be

very hostile if she was arrested and put on the stand."  (*Id.*)  Ms. Brody had "never had to do

that."  (*Id.*)  Had Ms. Brody called Ms. Barley, only for Ms. Barley to give hostile testimony

inconsistent with that which she gave at Defendant's state trial, Ms. Brody conceivably could

have "put her on the stand and impeach[ed] [her own] witness with her prior testimony," but Ms.

Brody did not think that "seem[ed] like a good option."  (*Id.* at 12–13.)

On cross-examination, Ms. Brody acknowledged that, "in terms of an overall defense, Ms. Barley provided an alternative version of the facts." (*Id.* at 15.)  She also conceded that "getting jurors to disbelieve police officers is difficult," and that "having a different version of the facts is a useful defense," so long as the witness providing that version is "credible." (*Id.*)  In response to questioning from Mr. Patel, she confirmed that neither she nor her investigator ever met with Ms. Barley in person, and that she never informed Ms. Barley about the Government's potential impeachment of Ms. Barley. (*Id.* at 17–18.)  In light of Ms. Brody's reference to her conversations with Ms. Gerardi, and Ms. Gerardi's conversations with jurors, Mr. Patel asked Ms. Brody whether she knew how many jurors with whom Ms. Gerardi had spoken. (*Id.* at 19–20.)  When Ms. Brody said that she did not, Mr. Patel asked her if she "[w]ould . . . be surprised to find that she only spoke to one," to which Ms. Brody responded that she did not know how many jurors with whom Ms. Gerardi had spoken, so Mr. Patel's question "[took] her nowhere." (*Id.* at 20.)  Ms. Brody also said that she and her colleagues "affirmatively made the decision that [they] weren't going to put [Ms. Barley] on, as [they] were getting ready to close, and as [Ms. Brody] had talked to" another potential witness whom she also did not call. (*Id.* at 21–22.)  "[T]he witnesses [whom Ms. Brody] had spoken to also factored into whether or not [they] were going to put [Ms. Barley] on the stand." (*Id.* at 22.)  Mr. Patel then asked, "So you're saying the interview of the witnesses who you met with in person . . . affected a decision about . . . calling a witness who had previously testified . . . [and who] provided [an] exculpatory defense . . . with whom you had never met in person." (*Id.*)  Ms. Brody said, "Correct." (*Id.*)  Before finishing his cross-examination, Mr. Patel read the substance of a stipulation entered into between the Parties, which was that the United States Marshal Service "is generally successful in locating a witness for whom a 'material witness' warrant is issued," and that "[w]hen the

Marshal Service has located a witness for whom a 'material witness' warrant had been issued," it "places that individual under arrest and transports them to the courthouse at which the witness's testimony is required."  (*Id.* at 23–24 (internal quotation marks omitted).)

On re-direct, Ms. Brody confirmed that "[t]he information that [AUSA Mermelstein] provided [her] about [Ms. Barley's] phone records . . . enter[ed] into [her] thinking as to whether to call [Ms. Barley]," because "if [Ms. Brody is] putting on a witness, [she] want[s] to have confidence that, number one, the witness is really telling the truth; and number two, that it's going to be a credible witness," especially when she is "banking [her] whole case on [that] one witness," and she thinks that the Government "is going to impeach them and the credibility is going to be a real problem."  (*Id.* at 25–26.)  Under such circumstances, "there may be an instance where [Ms. Brody] would put that person on the stand"—but Ms. Brody had also spoken with the three other witnesses whom she had considered calling, and their stories and Ms. Barley's story were not "in sync."  (*Id.* at 26.)  As a result, she "became concerned about [Ms. Barley's] testimony," and "worried about her credibility."  (*Id.*)  "From [her] side of the courtroom, [she] find[s] that when [the defense] put[s] on a witness who is totally impeachable and whose credibility starts to go out with the tide, that it's better not to put them on."  (*Id.*)

On re-cross, Mr. Patel asked Ms. Brody whether, in her state testimony, Ms. Barley had ever "denied speaking to [Defendant] on the phone."  (*Id.* at 27.)  Ms. Brody said that she did not recall.  Ms. Brody also stated that she was aware of the Government's potential impeachment of Ms. Barley before trial, but not before she last spoke with Ms. Barley on the phone, on May 15, 2012, and that she could have discussed the nature of Ms. Barley's relationship with Defendant before the meeting that she planned to conduct with Ms. Barley during trial.  (*Id.*)  Mr. Patel then asked Ms. Brody whether "it may have turned out that [Ms. Barley] would have told [her]" that

Ms. Barley and Defendant were not good friends, but that Ms. Barley called Defendant all the

time to find out "where he's DJ'ing," because she "follow[s] him," and that this might have been

"a perfectly rational explanation for the telephone records," an explanation of which Ms. Brody

had not been aware because she "never met with [Ms. Barley]." (*Id.* at 27–28 (internal quotation

marks omitted).)  Ms. Brody responded, "Perhaps." (*Id.* at 28.)

      After Ms. Brody was excused, the Parties conferred with the Court about her testimony,

their arguments, and the relevant case law.  Two issues of note were discussed during this

conference.  First, the Court observed that, if Ms. Brody's explanation of why she decided not to

seek a material witness warrant for Ms. Barley was "to be believed," then the core of

Defendant's argument might become that "the point of ineffectiveness was not necessarily the

decision [Ms. Brody] ma[de] . . . to go forward without Ms. Barley," but rather Ms. Brody's

failure to meet "with [Ms. Barley] beforehand to address, among other things, the possibility of

her having more contact with [Defendant] than she might have told" the agent who interviewed

her. (*Id.* at 49.)  Mr. Patel agreed. (*Id.* at 49–50.)  As he put it, "The fact that they used two

investigators from two different districts and sent her three different subpoenas kind of indicates

that they thought she was important.  And she was.  She was essential.  And she wasn't here, and

this lawyer never met with her.  Unexcusable and inexplicable." (*Id.* at 44.)

      Second, the Court remained concerned about an apparent disconnect between the

affirmation that Ms. Brody submitted and the testimony that she gave on the stand.  As described

above, Ms. Brody testified as to the tactical justifications that went into her decision not to seek a

material-witness warrant for Ms. Barley once she did not appear at trial, including her prior

discussions with Ms. Gerardi about the utility of Ms. Barley's testimony at Defendant's state

trial, Ms. Brody's knowledge of the Government's potential impeachment of Ms. Barley, and

Ms. Brody's concern that forcing Ms. Barley to testify after being arrested would result in her testimony turning hostile.  However, as the Court noted during the hearing, "[N]one of that is in her affidavit."  (*Id.* at 39.)  Ms. Brody's affidavit did not "mention anything about what the putative cross would have looked like or anything about any inconsistencies with what [Ms. Barley] told the agent about her connection to [Defendant] and what [Ms. Brody] might have learned in [AUSA Mermelstein's] excitement to cross-examine [Ms. Barley]."  (*Id.*)  This omission took on added significance in light of the fact that what she said at trial was that she did not have the *power* of the Government to call Ms. Barley, not that she had *elected* not to call Ms. Barley.  (*Id.* at 45.)  What her affirmation did contain was a reference to the Government's power to send agents to "intentionally, or otherwise intimidate, defense witnesses," as well as the allegation that Ms. Barley had informed Ms. Brody "that an agent had spoken to her and had not initially identified himself as a 'government' agent and that [Ms. Barley] had thought, at first, that he was working with the defense team."  (Brody Aff. ¶¶ 5–6.)  Yet Ms. Brody did not testify that the Government's supposed intimidation of Ms. Barley played any role in her decision to not seek the warrant.  As the Court asked at the hearing, "[W]hat's [that language] doing in [Ms. Brody's] affidavit?"  (Hr'g Tr. 51.)  To give her an opportunity to address both of these points, the Court recalled Ms. Brody to the stand.

On the first point, as to why the justifications for her decision that she gave during the hearing were not contained in her affidavit, Ms. Brody testified that she "just put in a very narrow affidavit thing."  (*Id.* at 62.)  Ms. Brody "reviewed [her] affidavit with another attorney in [her] office," and "that attorney felt that the affidavit [that she] did turn in was too expansive," and that the affidavit "should just . . . be . . . very tight."  (*Id.* at 63.)  She "didn't put all the reasons that [she] didn't pull [Ms. Barley] in."  (*Id.*)  On the second point, as to why she included

the Government's supposed intimidation of Ms. Barley in what was according to Ms. Brody intended to be a "very narrow affidavit," Ms. Brody stated that "[t]he person who reviewed [her] affidavit told [her] to get that out, that it was superfluous and unnecessary . . . .  It shouldn't have been in there.  (*Id.* at 64.)  The "easy answer" was that the language "had nothing to do with it." (*Id.*)  Ms. Brody suggested that she did not in fact believe that Ms. Barley was intimidated by her conversation with the agent.  (*Id.* at 64–65.)

The Court then asked Ms. Brody about the reasons she gave at trial for her decision not to seek a material-witness warrant for Ms. Barley, specifically her statement that she did not have the power of the Government to get people to trial to testify.  (*Id.* at 66–67.)  Ms. Brody said that she thought that the answer that she would have to give "would be possibly the immunity answer."  (*Id.* at 67.)  "Any witness is open to perjury.  Any witness is . . . open for whatever can happen if they misstate or they lie . . . .  [I]f [Ms. Brody has] a client who's facing charges, [she] can't . . . give a witness immunity."  (*Id.* at 67–68.)  On re-cross, to clarify Ms. Brody's answer, Mr. Patel asked her whether it was "[her] concern that [Ms. Barley] would need immunity for committing perjury?"  (*Id.* at 70.)  Ms. Brody stated that she "wasn't sure [that Ms. Barley] was going to be telling the truth."  (*Id.* at 71.)  Mr. Patel and the Court then both noted that not even the Government has the power to grant immunity from prosecution for perjury to a witness in order to encourage that witness to perjure herself at trial.  (*Id.*)  Following a brief re-direct, Ms. Brody stepped down again.  (*Id.* at 171–72.)

Defendant and the Government submitted post-hearing Memoranda of Law.  (*See* Def.'s Post-Hearing Mem. of Law in Supp. of His Mot. for a New Trial ("Def.'s Post-Hearing Mem.") (Dkt. No. 42);  Gov't's Post-Hearing Mem. of Law in Opp. to Def.'s Mot. for a New Trial ("Gov't's Post-Hearing Mem.") (Dkt. No. 41).)  In Defendant's Memorandum, he argues that

Ms. Brody's failure to interview the crucial exculpatory witness prior to trial independently, and Ms. Brody's combined errors collectively, amounted to ineffective assistance.  (*See* Def.'s Post-Hearing Mem. 7–13.)  For its part, the Government argues that Ms. Brody's preparation of Ms. Barley and her decision not to seek a material-witness warrant for Ms. Barley were both reasonable, and that Defendant was not prejudiced by Ms. Barley's preparation, or her absence as a trial witness.  (*See* Gov't's Post-Hearing Mem. 15–21.)

## II.  DISCUSSION

As noted above, in his two Memoranda, Defendant argues that Ms. Brody was ineffective for failing to (1) interview Ms. Barley prior to his federal trial; (2) request a material-witness warrant or continuance when Ms. Barley did not appear; or (3) seek to introduce Ms. Barley's state-trial testimony under Rule 804(b)(1) of the Federal Rules of Evidence when she did not appear.  After laying out the applicable standard of review, the Court will address each of these arguments in turn.

### A.  Standard of Review

#### 1.  Rule 33 of the Federal Rules of Criminal Procedure

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The Second Circuit has explained the standard of review for Rule 33 motions as follows:

> In deciding a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.  The ultimate test is whether letting a guilty verdict stand would be a manifest injustice.  To grant the motion, there must be a real concern that an innocent person may have been convicted.

*United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citations, alterations, and internal quotation marks omitted); *see also United States v. Russell*, No. 09-CR-968, 2014 WL 2558761, at *3 (E.D.N.Y. June 5, 2014) (same).

In addition to applying this standard of review to Defendant's ineffective-assistance claim, the Court must also consider whether his claim is properly brought at this stage of the proceedings.  In *United States v. Brown*, 623 F.3d 104 (2d Cir. 2010), the Second Circuit considered a district court's denial of a criminal defendant's claim of ineffective assistance of counsel after the defendant had been convicted in a trial before the district court, but before the district court had sentenced him.  The district court had held that the defendant's motion was an "improper . . . attempt[ ] to raise arguments that should be presented by way of a motion under 28 U.S.C. § 2255 following sentencing," and that the defendant's "ineffective-assistance claim should be brought, if at all, by way of a motion under § 2255, *after* [the defendant was] sentenced, not before."  *Id.* at 109 (alterations in original) (internal quotation marks omitted). The Second Circuit reversed, holding that "when a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceedings."  *Id.* at 113.  The court noted that it did "not agree with the district court that [the defendant] was precluded from raising his ineffective assistance of counsel claim until after he was sentenced."  *Id.* at 113 n. 5.  Instead, the court held that "the proper procedural avenue for defendants who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33."  *Id.*  The court also noted that "district courts face competing considerations in deciding whether it is appropriate to inquire into the merits of such claims prior to judgment, including principally the potential disruption of the proceedings,

especially if the attorney against whom the complaint is directed continues at the time to represent the defendant." *Id.* at 113.

Applying the holding in *Brown* to factual circumstances similar to those presented here, district courts within the Second Circuit have permitted defendants to file and have considered Rule 33 motions alleging ineffective assistance of counsel after conviction but prior to sentencing. *See, e.g.*, *United States v. Delarosa*, No. 09-CR-64-20, 2012 WL 3778855, at *4 (D. Vt. Aug. 30, 2012) ("Here, . . . no competing considerations exist because the court has appointed substitute counsel for [the defendant]. Accordingly, the court may evaluate Defendant's claim free from concern that it will disrupt the proceedings or impair the attorney-client relationship. In addition, the court notes that it has had a lengthy opportunity to observe [defense counsel's] performance before, during, and after trial, as well as the interaction between [defense counsel] and Defendant. The trial court may thus possess a unique perspective which may be difficult to replicate at the appellate level by examining only the transcripts of the various proceedings."), *aff'd*, 548 F. App'x 717 (2d Cir. 2013); *United States v. Barret*, No. 10-CR-809, 2012 WL 3229291, at *33 (E.D.N.Y. Aug. 6, 2012) (construing defendant's post-trial, pre-sentence "allegations of ineffective assistance of counsel as a basis for his motion for a new trial pursuant to Rule 33"); *United States v. Biear*, No. 09-CR-1185, 2012 WL 946964, at *4 (S.D.N.Y. Mar. 20, 2012) ("[I]f a defendant wishes to have the district court decide [ineffective-assistance-of-trial-counsel] issues prior to sentencing, then his proper course is to file a timely motion for a new trial under Rule 33 . . . ."); *United States v. Buczek*, No. 09-CR-121, 2010 WL 4451668, at *2 n.1 (W.D.N.Y. Nov. 4, 2010) (holding that "[c]onsideration of Defendant's ineffective assistance of counsel claim" at the post-trial, pre-conviction stage was "permissible"), *aff'd*, 457 F. App'x 22 (2d Cir. 2012).

41

Here, Defendant filed his Rule 33 Motion alleging ineffective assistance of counsel after trial but before sentencing.  Just as in *Delarosa*, there are "no competing considerations" militating against the Court's consideration of Defendant's Motion at this time, as the Court has appointed Mr. Patel as substitute counsel.  *See Delarosa*, 2012 WL 3778855, at *4.  And just as in *Delarosa*, the Court "has had a lengthy opportunity" to observe Ms. Brody's performance before, during, and after trial, as well as the interaction between Ms. Brody and Defendant.  *Id.* Accordingly, Defendant's Motion is properly filed, and the Court will consider it at this stage of the proceedings.

## 2.  *Strickland v. Washington*

A defendant claiming ineffective assistance of counsel must meet both prongs of the standard that the Supreme Court described in *Strickland v. Washington*, 466 U.S. 668 (1984), by "(1) demonstrating that his attorney's performance fell below an objective standard of reasonableness in light of prevailing professional norms, and (2) affirmatively prov[ing] prejudice arising from counsel's allegedly deficient representation."  *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010) (citations and internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 688, 693).

In regard to the "performance" prong, "a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound legal strategy."  *Id.* (alterations and internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and even strategic choices made after less than complete investigation do not

42

amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Rosario v. Ercole*, 601 F.3d 118, 129–30 (2d Cir. 2010) (alterations in original) (citations and internal quotation marks omitted) (quoting, *inter alia*, *Strickland*, 466 U.S. at 690).

With respect to the "prejudice" prong, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *Caracappa*, 614 F.3d at 46 (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693 (citations omitted). "'[P]urely speculative' arguments about the impact of an error do not establish prejudice." *DeCarlo v. United States*, No. 11-CV-2175, 2013 WL 1700921, at *4 (S.D.N.Y. Apr. 17, 2013) (alteration in original) (quoting *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991)). In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court elaborated on the standard that defendants must meet to prove prejudice under *Strickland*'s second prong:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

43

*Id.* at 791–92 (citations and internal quotation marks omitted); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) ("'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  That requires a 'substantial,' not just 'conceivable,' likelihood of a different result."  (citation omitted) (quoting *Richter*, 131 S. Ct. at 791)); *Pepe v. Walsh*, 542 F. App'x 54, 57 (2d Cir. 2013) ("There is no 'substantial' likelihood that, but for [counsel's] alleged ineffectiveness, a different result would have obtained." (quoting *Richter*, 131 S. Ct. at 792)); *Figueroa v. Schiraldi*, No. 10-CV-1821, 2013 WL 3486925, at *5 (S.D.N.Y. July 8, 2013) ("'[T]he likelihood of a different result must be substantial, not just conceivable.'" (quoting *Richter*, 131 S. Ct. at 792)); *Wright v. Lee*, No. 12-CV-6140, 2013 WL 1668266, at *5 (E.D.N.Y. Apr. 17, 2013) ("[P]etitioner did not come close to meeting the standard for showing prejudice under *Strickland*. . . .  [T]here is no 'substantial' likelihood that if petitioner's trial counsel had objected to the prosecutor's summation, the result of the trial would have been any different." (quoting *Cullen*, 131 S. Ct. at 1403)).

B.  Analysis

1.  Ms. Brody's Failure To Interview Ms. Barley Before Trial or Request a Material-Witness Warrant or Continuance When Ms. Barley Did Not Appear

a.  Performance Prong

Defendant's arguments that Ms. Brody was ineffective for failing to (1) interview Ms. Barley prior to his federal trial; and (2) request a material-witness warrant or continuance when Ms. Barley did not appear are separately cognizable claims of objectively unreasonable performance under *Strickland*'s first prong.  *See, e.g., Savinon v. Mazucca*, 318 F. App'x 41, 43 (2d Cir. 2009) ("Nor was it objectively unreasonable for counsel not to seek [the witness's] arrest on a material witness warrant given the improbability that [the witness] would ever

44

actually testify."); *Lopez v. Miller*, 915 F. Supp. 2d 373, 427 (E.D.N.Y. 2013) ("[I]t is well-established that the refusal even to *interview* a witness with potentially exculpatory information cannot be considered 'strategic' and thus generally constitutes deficient performance."); *Brooks v. United States*, No. 99-CV-2855, 2005 WL 2076565, at *6 (E.D.N.Y. Aug. 26, 2005) ("In regards to the first ineffective assistance claim, that trial counsel failed to request a continuance in order to find the witness, . . . . [the defendant] does not identify any information or controlling decisions . . . that would lead the Court to alter its conclusion that . . . counsel's failure to locate this unavailable witness was not 'objectively unreasonable.'" (alterations and internal quotation marks omitted)).

### i.  Ms. Brody's Failure To Interview Ms. Barley Before Trial

Defendant argues that, "[b]ecause Ms. Brody never met Ms. Barley, [Ms. Brody] never had an in person opportunity to assess Ms. Barley's credibility, to hear her account first-hand, nor did Ms. Brody have the opportunity to prepare Ms. Barley to testify in a federal trial." (Def.'s Post-Hearing Mem. 8.)  According to Defendant, "[a]n attorney cannot make a reasonable assessment of a defense case without meeting the crucial exculpatory witness. Witness interviewing and preparation is basic trial attorney responsibility." (*Id.*)  Defendant claims that "[n]o strategic explanation justifies Ms. Brody's failure to meet with Ms. Barley prior to [Defendant's] trial," (*id.* at 9), and that, as a result, Ms. Brody's "failure to meet with the key exculpatory witness—who had previously testified in a trial where [Defendant] was acquitted—falls below an objectively reasonable standard of representation and should accordingly be found deficient under *Strickland*," (*id.* at 10).

"[I]t is well-established that the refusal even to *interview* a witness with potentially exculpatory information cannot be considered 'strategic' and thus generally constitutes deficient

45

performance." *Lopez*, 915 F. Supp. 2d at 427; *see also Pavel v. Hollins*, 261 F.3d 210, 221 (2d Cir. 2001) ("[Counsel] should have directly contacted [the witness]—to learn more about the testimony that she would have offered, and to determine whether she might serve as a suitable witness based, *inter alia*, on [counsel's] assessment of her credibility.  But . . . . there is no indication in the record that [counsel] conducted *any* substantial, affirmative investigation into [the witness's] potential testimony. . . ."); *Rosario v. Ercole*, 582 F. Supp. 2d 541, 577 (S.D.N.Y. 2008) ("[C]ounsel's failure to locate and interview . . . potential witnesses . . . cannot be deemed strategic; it was only by contacting the witnesses that counsel could determine whether they could help petitioner's case or lead counsel to additional defense witnesses or evidence."), *aff'd*, 601 F.3d 118 (2d Cir. 2010); *cf. Samuels v. Bennett*, No. 03-CV-2340, 2009 WL 2516850, at *23 (S.D.N.Y. Aug. 17, 2009) (considering, but ultimately rejecting, the petitioner's argument that his counsel was ineffective for failing to interview a potential witness, because counsel "reasonably could have concluded that [the witness's] testimony was . . . too unreliable to risk presenting her as a defense witness at trial"); *Stubbs v. Harris*, 480 F. Supp. 523, 526 (S.D.N.Y. 1979) ("If in fact petitioner's counsel had failed to prepare or even personally interview prior to the morning of trial petitioner's only witness with the result that the testimony of a possibly truthful witness was destroyed, a miscarriage of justice of constitutional dimensions might well have occurred.").

However, as the Government states in its Post-Hearing Memorandum, "[c]ourts have generally not required any particular method . . . of witness interviews," and "have repeatedly found that witness interviews and preparation may properly take place by phone."  (Gov't's Post-Hearing Mem. 9.)  For example, in *Madrigal v. Yates*, 662 F. Supp. 2d 1162 (C.D. Cal. 2009), the petitioner claimed that he was denied the effective assistance of counsel on a number

of different grounds, including that his counsel failed to interview a witness who would have

corroborated his alibi.  *Id.* at 1189–90.  The court rejected the petitioner's claim:

> The Court disagrees with Petitioner's argument that [his counsel] failed to
> adequately interview [the witness].  At the evidentiary hearing, [the witness] testified
> that he had spoken on the phone with [Petitioner's counsel] . . . .  [The witness] also
> testified that [Petitioner's counsel] requested that [the witness] come to Petitioner's
> trial to testify.  Therefore, because [Petitioner's counsel] spoke with [the witness] by
> telephone, obtained the relevant information from him, and asked him to come to
> testify, the Court finds that [Petitioner's counsel] adequately interviewed [the
> witness].

*Id.* at 1189 n.21 (citations omitted).

In a number of other cases, including a recent one from within the Second Circuit, courts

have similarly suggested that counsel may fulfill their duty to interview witnesses with

potentially exculpatory information telephonically.  *See, e.g.*, *Fautenberry v. Mitchell*, 515 F.3d

614, 634 (6th Cir. 2008) (rejecting the petitioner's argument that his attorneys had "not

interview[ed] any of the out-of-state witnesses," which the petitioner "surmise[d]" must have

been the case because "his attorneys [had] billed most of their investigation time in one-hour

increments," on the grounds that the argument did "not account for the reasonable inference that

counsel interviewed some of the witnesses (including out-of-state witnesses) via phone"); *Turner*

*v. Williams*, 35 F.3d 872, 896 (4th Cir. 1994) ("As for [counsel's] failure to conduct face-to-face

(as opposed to telephone) interviews or meet personally with defense witnesses prior to the

resentencing proceeding, [counsel] did not deem such meetings necessary because he generally

was familiar with the substance of what these witnesses would say. . . .  In addition, he had

telephoned potential defense witnesses the month before the resentencing proceeding.  Although

face-to-face meetings with witnesses may be the more desirable approach, we cannot say that

[counsel's] performance was unreasonable. . . ."), *overruled on other grounds by O'Dell v.*

*Netherland*, 95 F.3d 1214 (4th Cir. 1996), *aff'd*, 521 U.S. 151 (1997); *United States v. Peterson*, 896 F. Supp. 2d 305, 316–17 (S.D.N.Y. 2012) ("[The petitioner] asserts that his attorney did not interview several witnesses who purportedly would have exculpated him. . . . [However,] only one of the purported witnesses [the petitioner] identifies has submitted an affidavit, and she confirms that [counsel] did interview her. . . . via telephone . . . . [The petitioner thus] offers no proof . . . that his attorney failed to . . . interview witnesses.").

Here, at the evidentiary hearing that the Court held on Defendant's Motion, on direct examination, Ms. Brody described a telephone interview that she and her trial team conducted with Ms. Barley, who was living out of state at the time:

> Q: Did there come a time when you spoke to Ms. Barley directly?
>
> A: Yes. . . .  We talked to Ms. Barley on a speaker phone . . . on May 15th.  Glen[n] Almas was there.  I was there.  [Mr. Thompson-Hicks] was there.  And we spoke to [Ms. Barley] about the case.  We spoke to her about coming up.  We spoke to her about her testimony, about her prior testimony.
> . . . .
>
> Q: . . . [D]id [Ms. Barley] indicate to you whether she was willing to testify on behalf of the defense?
>
> A: Yes.
>
> Q: And during that conversation, did you discuss what the substance of Ms. Barley's testimony would be?
>
> A: Yes.

(Hr'g Tr. 6–8.)  Thus, just as the petitioner's counsel did in *Madrigal*, Ms. Brody "spoke[] on the phone with" Ms. Barley, and "requested that [Ms. Barley] come to [Defendant's] trial to testify." *Madrigal*, 662 F. Supp. 2d at 1190 n.21.  During the same conversation, Ms. Brody and Ms. Barley also discussed the content of Ms. Barley's prior testimony at Defendant's state trial, and

the likely content of the testimony that Ms. Brody expected Ms. Barley to give if she were to be called at Defendant's federal trial.

In the section of Defendant's Post-Hearing Memorandum in which he argues that Ms. Brody was deficient for failing to interview Ms. Barley, Defendant does not mention this telephone interview at all, but instead repeatedly emphasizes the fact that Ms. Brody and Ms. Barley never "met" or had "in-person" contact.  (*See, e.g.*, Def.'s Post-Hearing Mem. 8 ("Because Ms. Brody never *met* Ms. Barley, she never had an *in person* opportunity to assess Ms. Barley's credibility . . . ." (emphasis added)); *id.* ("An attorney cannot make a reasonable assessment of a defense case without *meeting* the crucial exculpatory witness." (emphasis added)); *id.* ("Only when you *personally meet* with the witness and review his testimony will you get a feel for the witness . . . ." (emphasis added) (internal quotation marks omitted)); *id.* ("*Meeting* witnesses *in person* and preparing them to testify, takes time to do well . . . ." (emphasis added) (internal quotation marks omitted)); *id.* at 9 ("No strategic explanation justifies Ms. Brody's failure to *meet* with Ms. Barley prior to [Defendant's] trial." (emphasis added)); *id.* at 9–10 ("Ms. Brody does not contend that there was a strategic reason for her failure to *meet* Ms. Barley . . . ." (emphasis added)); *id.* at 10 ("Ms. Brody . . . chose not to *meet* [Ms. Barley] until it was too late." (emphasis added)); *id.* (noting "counsel's failure to *meet* with the key exculpatory witness" (emphasis added)).)

But in this regard, Defendant's argument is a straw man.  As described above, counsel's duty is to *interview* witnesses with potentially exculpatory information.  Defendant does not cite to, and the Court is unaware of, any case in which a court has held that counsel may fulfill this duty *only* by interviewing witnesses face-to-face, and that telephone interviews are per se inadequate.  In fact, also as described above, a number of courts have suggested that the opposite

49

is true.  The only authority that Defendant cites in support of his argument is a book on trial practice, in which the author states the following: "Only when you personally meet with the witness and review his testimony will you get a feel for the witness; understand how he talks, sounds, and acts; and become able to use that information." (*Id.* at 8 (quoting Thomas A. Mauet, *Trials: Strategy, Skills, and the New Powers of Persuasion* 21 (2d ed. 2009).)  As a general proposition, this may very well be good advice.  But "[a]lthough face-to-face meetings with witnesses may be the more desirable approach," that does not mean that counsel's failure to meet with a witness in person is "unreasonable." *Turner*, 35 F.3d at 896.  Accordingly, the Court finds that, "because [Ms. Brody] spoke with [Ms. Barley] by telephone, obtained the relevant information from [her], and asked [her] to come testify, . . . [Ms. Brody] adequately interviewed [Ms. Barley]," and was therefore not constitutionally ineffective for failing to meet her in person, especially where Ms. Barley was living outside New York at the time. *Madrigal*, 662 F. Supp. 2d at 1189 n.21.

### ii.  Ms. Brody's Failure To Request a Material-Witness Warrant or Continuance When Ms. Barley Did Not Appear

Defendant also argues that Ms. Brody was ineffective for failing to request a material-witness warrant, as her "explanations for not [doing so] were neither strategic nor reasonable." (Def.'s Post-Hearing Mem. 11.)  As described previously, at Defendant's trial, Ms. Brody represented to the Court that she was planning to call Ms. Barley, (*see* Federal Trial Tr. 172), but when the time came, and Ms. Barley did not appear, Ms. Brody told the Court that she had "not been able to track down Ms. Barley for the past five days," that she had "sent people to her house" and had "subpoenaed her," and that she did not "have the power of the government to get

people" to trial to testify, (*id.* at 235).  However, as described previously, on direct examination

at the evidentiary hearing on Defendant's Motion, Ms. Brody elaborated on this explanation:

> Q: What did you understand your options to be when Ms. Barley did not appear for the trial?
>
> A: Well, my options, obviously, were to get a "material witness" subpoena.
>
> Q: And what did you understand would happen if you got a material witness subpoena?
>
> A: The marshals would go, essentially, and arrest her and bring her into court.
>
> Q: And would that force her to meet with you prior to testifying?
>
> A: No.
>
> Q: Did you seek a "material witness" warrant?
>
> A: No.
>
> Q: Why not?
>
> A: Because I do not want, and very few defense attorneys, I think, would want, a witness who could be very hostile if she was arrested and put on the stand.  I've never had to do that.  I don't know.  When somebody says they're going to show up and they don't show up, the marshals go, they arrest them, I mean would she talk to me before?  I don't know, you know.
>
> Q: You had Ms. Barley's prior testimony.  Had she testified in a way that was different than her prior testimony, what could you have done with her prior testimony to impeach a changed story?
> . . . .
>
> A: You mean, like put her on the stand and impeach my witness with her prior testimony?  I don't think that a jury—it didn't seem like a good option.

(Hr'g Tr. 11–13.)

    Ms. Brody also explained that, even though Ms. Barley was on the witness list that she

originally gave to the Government, she did not know whether she would have called Ms. Barley

as a witness even had Ms. Barley appeared at trial:

There is a lot that goes into . . . a decision to put somebody on the stand. It was my belief during the trial—it remains my belief—that the cops lied, that [Mr. McKenzie] changed his testimony and he lied. And based on my discussions with [Ms. Gerardi] previously, based on the cops' testimony, [Mr. Thompson-Hicks] and I made a trial decision.

I don't know if I would have put her on. I would have had to speak to her first to make sure that we were all on the same page.

(*Id.* at 11.)

Ms. Brody's mention of "discussions [Ms. Gerardi]" was a reference to conversations

that Ms. Brody also described on direct examination at the evidentiary hearing:

Q: Did you have any conversations with [Ms. Gerardi] about Ms. Barley's testimony in the state trial?

A: Yes.

Q: And during those conversations, what, if anything, did [Ms. Gerardi] tell you about Ms. Barley's testimony?
. . . .

A: My understanding, in talking to Ms. Gerardi, was that Ms. Barley's testimony was of no moment; that she, in talking to jurors—my understanding from my discussion with her is that Ms. Barley was not either an essential witness or a material witness. And it was my understanding that she wasn't a significant component.

Q: And why was she not a significant component?

A: My understanding, based on discussions with Ms. Gerardi, was that the jury did not believe the cops, and that the acquittal was based on their not believing the cops.

(*Id.* at 5–6.)

On re-direct examination, Ms. Brody offered an additional reason for why she was

unsure whether she would have called Ms. Barley as a witness even if she had appeared:

Q: [D]id you ever have conversations with the government about its intended cross-examination of Ms. Barley?

A: Yes.
. . . .

52

Q: And what was the nature of those conversations?

A: The nature of the conversations was that . . . [AUSA Mermelstein] had information, and [she was] going to cross-examine [Ms. Barley], and that there was—I don't remember if [AUSA Mermelstein] used the word "perjury." But what I took from [my conversations with AUSA Mermelstein] was, [AUSA Mermelstein] believed that [Ms. Barley] had perjured herself at the state trial about her relationship with [Defendant], because in the state trial, I think she said something like she hardly knew him, or she knew him a little bit. And [AUSA Mermelstein] had information from [Ms. Barley's] cell phone records that there were a lot of calls back and forth, and [Ms. Barley] knew [Defendant] a lot better than she had indicated when she was on the stand. And I don't remember if [AUSA Mermelstein's] words were "rip her heart out," but that was kind of the feeling that I got, that [AUSA Mermelstein was] going to totally discredit her as a witness.

. . . .

Q: . . . The information that Ms. Mermelstein provided you about the phone records of [Ms. Barley], did that enter into your thinking as to whether to call her?

A: Absolutely.

. . . .

Q: And in what way did that enter into your thinking?

A: Because once—if I'm putting on a witness, I want to have confidence that, number one, the witness is really telling the truth; and number two, that it's going to be a credible witness, particularly in an instance if I'm putting one witness—if I'm banking my whole case on one witness, and I think the government is going to impeach them and the credibility is going to be a real problem, there may be an instance where I would put that person on the stand. But I had also talked to these three other witnesses, and I had a different—their stories, everything, wasn't in sync. So I became concerned about her testimony. I was worried about her credibility.

. . . .

From my side of the courtroom, I find that when we put on a witness who is totally impeachable and whose credibility starts to go out with the tide, that it's better not to put them on.

(*Id.* at 9–10, 25–26.)

Thus, although Ms. Brody's testimony was somewhat disjointed, her thought process

may be fairly summarized as follows. Ms. Brody was unsure whether she would have called Ms.

Barley even if she had appeared, for two interrelated reasons: (1) based on her conversations

53

with Ms. Gerardi, Ms. Brody was skeptical as to whether Ms. Barley's testimony at Defendant's

state trial was a significant factor in his acquittal, and as a result, Ms. Brody questioned whether

calling Ms. Barley at Defendant's federal trial would be beneficial; and (2) based on her

conversations with AUSA Mermelstein, as well as her conversations with other witnesses that

she had considered calling, Ms. Brody was concerned that the Government would substantially

impeach Ms. Barley's credibility if she were to testify.  When Ms. Barley ultimately did not

appear, Ms. Brody believed that she had two options: (1) not to call Ms. Barley as a witness,

which is an option that she might have taken even if Ms. Barley had appeared; or (2) to request a

continuance from the Court in order to seek a material-witness warrant for Ms. Barley's arrest.

Ms. Brody was worried that, if she were to take the second option, Ms. Barley might become

hostile, given that her presence at Defendant's trial would have followed her arrest by United

States Marshals at Defendant's behest.  Given Ms. Brody's original concerns about the utility

and credibility of Ms. Barley's testimony, the risk that Ms. Barley would also be hostile appears

to have pushed Ms. Brody over the edge from considering calling Ms. Barley to making the

affirmative decision not to do so.

"It is well-settled that the decision whether to call any witnesses on behalf of the

defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by

defense attorneys in almost every trial."  *Coke v. Superintendent, Green Haven Corr. Facility*,

No. 06-CV-811, 2010 WL 475274, at *7 (W.D.N.Y. Feb. 5, 2010) (alterations and internal

quotation marks omitted) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.

1987)); *see also McNab v. New York*, No. 12-CV-3797, 2014 WL 1744114, at *11 (S.D.N.Y.

Mar. 10, 2014) (same).  Accordingly, "[c]ourts applying *Strickland* are especially deferential to

defense attorneys' decisions concerning which witnesses to put before the jury."  *Woods v.*

*Heath*, No. 12-CV-2175, 2013 WL 6092804, at *16 (E.D.N.Y. Nov. 19, 2013) (internal

quotation marks omitted) (quoting *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005)); *see also*

*Yik Man Mui v. United States*, No. 99-CV-3627, 2013 WL 6330661, at *9 (E.D.N.Y. Dec. 5,

2013) ("The decision not to call a particular witness is typically a question of trial strategy that

appellate courts are ill-suited to second-guess." (internal quotation marks omitted) (quoting

*United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998))).  "Thus, the failure to call a witness

for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of

counsel."  *Savinon v. Mazucca*, No. 04-CV-1589, 2005 WL 2548032, at *24 (S.D.N.Y. Oct. 12,

2005) (internal quotation marks omitted), *adopted by* 2006 WL 2669331 (S.D.N.Y. Sept. 18,

2006), *aff'd*, 318 F. App'x 41 (2d Cir. 2009); *see also Rogers v. Chappius*, No. 12-CV-148, 2013

WL 1825505, at *12 (W.D.N.Y. Apr. 30, 2013) ("[T]he tactical decision of whether to call

specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed

as a lapse in professional judgment." (internal quotation marks omitted) (quoting *United States v.*

*Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997))).  "[H]owever, the decision not to call a witness must

be grounded in some strategy that advances the client's interests."  *Eze v. Senkowski*, 321 F.3d

110, 129 (2d Cir. 2003); *see also Baldwin v. United States*, No. 11-CV-1420, 2013 WL 593770,

at *3 (D. Conn. Feb. 13, 2013) (same).

      Courts have repeatedly recognized that counsel's decision not to call a witness, when

driven by any one of the considerations that Ms. Brody described in her testimony—regarding

the potential witness's utility, credibility, or hostility—is tactical in nature, and therefore does

not serve as the basis for a successful ineffective-assistance claim.  *See, e.g.*, *United States v.*

*Love*, 939 F. Supp. 2d 261, 267 (W.D.N.Y. 2013) (rejecting the defendant's claim that his

counsel was ineffective for failing to call a witness, in part because the witness's testimony

"would have either been inadmissible, or of markedly limited value"); *Edwards v. Rock*, No. 09-CV-1387, 2013 WL 80176, at *13 (E.D.N.Y. Jan. 7, 2013) (rejecting the petitioner's claim that his counsel was ineffective for failing to call additional witnesses, in part because "counsel may very well have concluded as a matter of strategy that it was not in [the] [p]etitioner's interest to . . . call to the stand specific individuals singled out by [the] [p]etitioner," as it was "unclear what, if any, value would have been added by the testimony of the witnesses proposed by [the] [p]etitioner"); *Whiting v. La Clair*, No. 09-CV-1903, 2012 WL 3930401, at *6 (E.D.N.Y. Sept. 7, 2012) ("[A]n attorney's concern that calling a particular witness could open the door to potentially damaging testimony is a sound tactical basis for deciding not to call that witness." (alterations and internal quotation marks omitted)); *Rosario v. Smith*, No. 07-CV-3611, 2009 WL 1787715, at *4 (S.D.N.Y. June 23, 2009) ("The decision not to call . . . potentially hostile witnesses . . . [is] within the broad range of tactical decisions entitled to deference."); *Schulz v. Marshall*, 528 F. Supp. 2d 77, 92 (E.D.N.Y. 2007) ("The Second Circuit has noted several legitimate, tactical reasons for failing to call a defense witness.  For example, an attorney may choose not to call a witness where . . . the witness is 'unfriendly' to the defendant. . . .  Further, the Second Circuit has specifically noted that the failure to call a[] . . . witness that would likely face effective impeachment cannot constitute ineffective assistance of counsel." (citing *Greiner*, 417 F.3d at 323; *Bennett v. Fischer*, 246 F. App'x 761, 765–66 (2d Cir. 2007))), *aff'd sub nom. Schulz v. Marshal*, 345 F. App'x 627 (2d Cir. 2009); *Bonilla v. Portuondo*, No. 00-CV-2369, 2004 WL 350694, at *11 (S.D.N.Y. Feb. 26, 2004) (rejecting the petitioner's claim that his counsel at his second trial was ineffective for failing to call certain witnesses, because his counsel testified at an evidentiary hearing that he had believed that such witnesses' "testimony at the first trial wasn't too helpful," and that, based on interviews with jurors from the first trial,

56

"the jurors discredited [the witnesses'] testimony"), *adopted by* 2004 WL 1782174 (S.D.N.Y.

Aug. 9, 2004); *Ortiz v. United States*, No. 01-CV-9990, 2002 WL 31427356, at *2 (S.D.N.Y.

Oct. 30, 2002) ("The possible damage that could be done to a defendant's case on cross-

examination of a defense witness is a tactical consideration that may well recommend against

calling a witness."); *Martinez v. United States*, No. 95-CV-1540, 1997 WL 214935, at *6

(S.D.N.Y. Apr. 24, 1997) ("[A]n attorney's tactical decision not to call an allegedly exculpatory

witness does not constitute ineffective representation, since that witness's testimony could have

been impeached.").

  Thus, based on the testimony that Ms. Brody gave at the evidentiary hearing, which the

Court finds to be credible, the Court concludes that Ms. Brody's reasons for deciding not to seek

a material-witness warrant for Ms. Barley fell "within the broad range of tactical decisions

entitled to deference." *Rosario*, 2009 WL 1787715, at *4.  It may be true, as Defendant argues,

that on their face, the reasons that Ms. Brody gave at trial for that decision, including her

statement that she "did not have the power of the government to get people" to trial to testify,

(Federal Trial Tr. 235), appear to have been "neither strategic nor reasonable," (Def.'s Post-

Hearing Mem. 11).  However, the Court—to which such statements were directed—did not take

Ms. Brody's answer literally.  In light of Ms. Brody's extensive experience as a criminal-defense

attorney, (*see* Hr'g Tr. 3 ("Q: And how long have you been employed [at the Federal Defenders,

Southern District of New York]?  A: A little bit more than 24 years.  Q: In those approximately

24 years, approximately how many clients have you represented?  A: Many hundreds, if not

thousands."), of which the Court was well aware, to do so would not have been reasonable,

either.  Rather, the Court interpreted Ms. Brody's answer to be her commentary on what she

perceives as a disparity in soft power to secure a witness's presence at trial between the

Government and defense counsel.  What is more, the Court did not take Ms. Brody's answer as a comprehensive summary of all the reasons why she had decided not to call Ms. Barley.  Indeed, the Court did not ask at that time for Ms. Brody's full explanation of her trial strategy.[3]

For all of these reasons, the Court concludes that Ms. Brody's decision not to seek a material-witness warrant for Ms. Barley was "grounded in [a] strategy" designed to "advance[] [Defendant's] interests," *Eze*, 321 F.3d at 129, and that Defendant has therefore failed to rebut the "strong presumption that [Ms. Brody's] conduct falls within the wide range of reasonable professional assistance," and "that, under the circumstances, the challenged action might be considered sound legal strategy." *Caracappa*, 614 F.3d at 46 (alterations and internal quotation marks omitted).[4]

---

[3] The Court also notes that Ms. Brody's sarcastic tone at the trial, which cannot be captured by a mere transcript, and which is not unusual for Ms. Brody, at most reflects Ms. Brody's cynicism about some aspects of the criminal justice system, not her ignorance of the Federal Rules of Criminal Procedure.

[4] To the extent that Defendant is attempting to argue that Ms. Brody was ineffective on the independent ground that she failed to request a continuance for the purpose of determining the reason for Ms. Barley's failure to appear, instead of for the purpose of seeking a material-witness warrant for Ms. Barley, such argument is wholly undeveloped.  In fact, Defendant makes only three brief statements that might be construed as supporting such an argument.  (*See* Def.'s Mem. 10 ("Ms. Brody neither made a request for a Material Witness Warrant, nor asked for a continuance in an effort to locate a key exculpatory witness . . . ."); Def.'s Post-Hearing Mem. 10 ("When Ms. Barley did not appear to testify, rather than taking steps legally available, such as requesting a material witness warrant or an adjournment, Ms. Brody rested."); *id.* at 11 ("Ms. Brody did not request an adjournment to find out why Ms. Barley failed to appear in court.").)  As explained in detail above, the clear thrust of Defendant's submissions is that Ms. Brody was ineffective for failing to interview Ms. Barley, to seek a material-witness warrant, and to seek to introduce Ms. Barley's state-trial testimony under Rule 804(b)(1) of the Federal Rules of Evidence.  Regardless, such an argument fails *Strickland*'s prejudice prong, for all of the reasons discussed below in the section of this Opinion that addresses that subject, and also because there is no reason to believe that the Court would have granted the requested continuance, *see McTier v. New York*, No. 07-CV-870, 2009 WL 792087, at *6 (E.D.N.Y. Mar. 23, 2009) ("Petitioner is not entitled to a continuance as a matter of right.  The grant or denial of a continuance is left to the sound discretion of the trial court."), or that Ms. Brody expected that such a request would

### b.  Prejudice Prong

However, even if Ms. Brody's conduct fell outside the wide range of reasonable professional assistance, Defendant's claim would still fail, as he cannot demonstrate the prejudice resulting from any such deficient performance that *Strickland*'s second prong requires.

As noted above, Defendant's arguments that Ms. Brody was ineffective for failing to interview Ms. Barley prior to his federal trial and to request a material-witness warrant or continuance when Ms. Barley did not appear are separately cognizable claims of objectively unreasonable performance under *Strickland*'s first prong.  But for purposes of *Strickland*'s second prong, these arguments can be analyzed together, because Ms. Brody's failure to interview Ms. Barley before Defendant's federal trial, as well as her failure to request a material-witness warrant or continuance when Ms. Barley did not appear, can have prejudiced Defendant only if there is a "reasonable probability" or "substantial likelihood" that had Ms. Barley testified, Defendant would have been acquitted.  *See Cullen*, 131 S. Ct. at 1403.  Defendant tethers all of his arguments to the notion that "[t]he failure to present a defense at his federal trial," in the form of calling Ms. Barley as a witness, "is the principal difference between his federal and state trials."  (Def.'s Mem. 12; *see also* Def.'s Post-Hearing Mem. 13 ("Ms. Barley's testimony was the difference between [Defendant's] state acquittal and his federal conviction.").)  According to Defendant, "[a]t his federal trial, the jurors only heard the government's case," and "did not learn that an eye-witness testified that [Defendant] was not carrying a gun, but the microphone stand from his dee-jay equipment.  This disparity made all the difference in the outcomes of his two trials."  (Def.'s Mem. 12.)

---

have been granted.

59

The Court disagrees, and finds that Defendant cannot make his required showing of prejudice for three principal reasons: (1) there are serious questions as to whether Ms. Barley's testimony was the driving force behind Defendant's acquittal at his state trial; (2) there were important differences between Defendant's state and federal trials besides Ms. Barley's testimony, differences that made Defendant's conviction at the latter much more likely; and (3) had Ms. Barley testified at Defendant's federal trial, she likely would have been effectively impeached, minimizing the value of her testimony to Defendant.  While the Court makes no finding as to whether any one of these reasons would be dispositive standing alone, it is convinced that their cumulative effect is to defeat Defendant's attempted showing of prejudice.

### i.  Ms. Barley's State Trial Testimony and Defendant's Acquittal

The transcript from Defendant's state trial makes clear that Ms. Gerardi's primary trial strategy was not to counter the police witnesses' version of events with Ms. Barley's version of events, and let the jury decide between the two.  Rather, Ms. Gerardi's primary strategy was to undermine the police witnesses' version of events through rigorous cross-examination, thus introducing reasonable doubt into the jurors' minds.  The manner in which this strategy played out at trial is described in depth above, but a brief rehash of Ms. Gerardi's opening statement and summation drive the point home.

During Ms. Gerardi's opening statement, she asked the jury to "keep the District Attorney to her burden of proof," and "remember that [Ms. Gerardi did not] have any burden to prove or disprove anything."  (State Trial Tr. 175.)  She also stated that once the jury "listen[ed] to all of the evidence in [the] case, the lack of evidence, the insufficiency of the evidence," it would find Defendant not guilty.  (*Id.*)  During Ms. Gerardi's summation, she said that the State's case was "full of reasonable doubts," and that she "intend[ed] to show [the jury] what

60

they [were]." (*Id.* at 437.)  She then went on to claim that there was no "physical evidence" in the form of fingerprints or DNA, because the Mount Vernon Police Department had "failed to preserve the integrity of [the] gun when they handled it," and highlighted the number of people who handled the gun before it ended up in an evidence box.  (*Id.* at 437–38.)  She also attacked the investigation strategy, recalling that evidence was introduced at trial that there were 60 to 80 people standing in front of The Calabash when the police arrived on the scene, but that there was "no evidence whatsoever" that "any investigation of any of those people in front of that location ever took place."  (*Id.* at 440.)  The police did not ask "anybody any questions," but "just acted on what somebody in the street said and then went and got that person, arrested him, and that was it." (*Id.*)  Ms. Gerardi went on to repeat previous attacks that she had made during cross-examination on the testimony of the prosecution's law-enforcement witnesses, summarizing for the jury the inconsistencies between that testimony and written materials such as Officer Stewart's police report and the evidence receipt he signed.  (*Id.* at 443–45.)

Ms. Barley was not mentioned at all, either directly or indirectly, in Ms. Gerardi's opening statement, and was a comparatively minor feature of Ms. Gerardi's summation.  In fact, as the transcript of Ms. Gerardi's summation reveals, she spent approximately 230 lines of text attacking the State's evidence, but only 50 discussing Ms. Barley.   (*Id.* at 437–49.)  Ms. Gerardi used most of the time that she spent on Ms. Barley trying to fend off ADA Nagler's attacks on Ms. Barley's credibility, not on describing what Ms. Barley said on the stand.  (*Id.* at 447–48.)  Ms. Gerardi thought that the "bigger" and "more important" issue was whether there was "any evidence in the record that the police did their job in questioning witnesses."  (*Id.* at 449.)  In conclusion, Ms. Gerardi boiled her case down to its essence when she stated that "there [was] no DNA evidence, there [was] no fingerprint evidence, there [was] no investigation of witnesses,

there [were] just contradictions and inconsistencies." (*Id.*) Ms. Gerardi thus made Defendant's

state trial a case about the weakness of the evidence put forth by the People, not the strength of

the evidence put forth by the defense. For the purposes of analyzing *Strickland*'s prejudice

prong, and absent evidence to the contrary, it seems a fair inference that the jury acquitted

Defendant primarily on the basis of the reasons that Ms. Gerardi spent so much time

emphasizing throughout the trial.

      This interpretation is further bolstered by the opinion of the attorney who orchestrated the

trial strategy in question. As described above, according to Ms. Brody's sworn testimony during

the evidentiary hearing, Ms. Brody's "understanding, in talking to Ms. Gerardi, was that Ms.

Barley's testimony [at the state trial] was of no moment [to Defendant's acquittal]," and that Ms.

Barley "was not either an essential witness or a material witness," nor a "significant component"

of Defendant's acquittal. (Hr'g Tr. 5–6.) "[B]ased on discussion with Ms. Gerardi," Ms. Brody

thought that "the jury did not believe the cops, and that the acquittal was based on their not

believing the cops." (*Id.*) Ms. Brody also stated that Ms. Gerardi's opinion on this front was at

least in part the result of "talking to jurors" about the reasons for Defendant's acquittal. (*Id.*)

While Mr. Patel insinuated during his cross-examination of Ms. Brody that Ms. Gerardi had

spoken to only one juror, (*see id.* at 20), Ms. Gerardi may have had other reasons for her belief.

Further, that one juror is one more than the number of jurors that Defendant has suggested have

expressed contrary opinions as to why they voted the way that they did.

      Of course, after the close of evidence, the jury did send the court several notes asking to

review "Info from witness about mic stand—was evidence the stand at scene," "Defense attorney

testimony when the mic stand was put in evidence,'" and "'DEF,' which [the court took] as

Defense, 'witness regarding mic stand.'" (State Trial Tr. 490, 495 (some internal quotation

marks omitted).)  But the jury also sent the court notes asking to review seven other categories of evidence, all seven of which related to the prosecution's case or Ms. Gerardi's attacks thereupon. (*Id.* at 495, 500, 509, 522.)  While it is true that the very first note that the jury sent to the court included a request to review evidence related to the microphone stand, (*see id.* at 490), evidence which was introduced through and explained by Ms. Barley's testimony, that fact cuts both ways.  It might have been included in the jury's first request because the jury thought it was the most important piece of evidence; conversely, the fact that the jury asked for so much additional evidence largely unrelated to Ms. Barley's testimony in addition to or after reviewing evidence related to the microphone stand might also suggest that the jury's review of the microphone-stand evidence was not conclusive, and left them unable to reach a decision.  Thus, the jury notes are inconclusive.

To be clear, none of this is to suggest that Ms. Barley's testimony at Defendant's state trial was not helpful to Defendant, or that Ms. Barley's testimony did not factor into the jury's decision to acquit him in some way.  It is only to suggest that Defendant very well might have been acquitted even had Ms. Barley not testified at his state trial, which weakens his argument that had Ms. Barley testified at his federal trial, there is a substantial likelihood that he would have been acquitted there as well.

### ii.   Important Differences Between the Federal and State Prosecutors' Evidence

Although Defendant argues that "Ms. Barley's testimony was the difference between [Defendant's] state acquittal and his federal conviction," (Def.'s Post-Hearing Mem. 13), a side-by-side comparison of the transcripts from these two trials—the second of which this Court observed from a front-row seat—does not support this assertion.  There are numerous other

differences, two of which in particular appear to have been key to the differing results.  First and foremost, Mr. McKenzie testified at Defendant's federal but not his state trial.  The importance of Mr. McKenzie's testimony to the Government's case at Defendant's federal trial cannot be overstated.  Second, AUSA Mermelstein's fronting of apparent inconsistencies in the police-officer witnesses' testimony contrasts sharply with ADA Nagler's decision to let Ms. Gerardi draw these inconsistencies out on cross-examination to damaging if not devastating effect.

In regard to Mr. McKenzie, it bears reinforcing that Ms. Gerardi's strategy at Defendant's state trial was to draw the jury's attention not only to inconsistencies and weaknesses in the People's version of events, but also to the type of witnesses supplying that version for the People's benefit.  Despite there having been at least "60 to 80 people that were standing in front of [T]he Calabash when [Officers Stewart, Byrwa, and Bovell] came to the scene," there was "no evidence whatsoever that any investigation of any of those people in front of that location ever took place."  (*Id.* at 440.)  The prosecution called three police officers and one police ballistics expert as its witnesses—given the number of people Ms. Gerardi made sure to explain were present when Defendant's arrest took place, the jury might have likened this lineup to a hometown officiating crew.  Ms. Gerardi certainly sought to help them along this line of reasoning.  As described previously, she told the jury during her summation that "[n]obody asked anybody any questions."  (*Id.*)  She "submit[ted] [to the jury] that the testimony of these two eyewitness police officers[, Officers Stewart and Bovell, was] unreliable, untrustworthy, contradictory and full of mistakes."  (*Id.* at 441.)  She asked the jury, "would you rely on either of these two individuals for anything that was important to you in your life?"  (*Id.* at 443–44.)

Contrast the all-police witness lineup at Defendant's state trial with the witness lineup at his federal trial, where the Government substituted Mr. McKenzie for Detective Holzman.  The

Government correctly describes Mr. McKenzie, the owner of the nightclub formerly known as

The Calabash, as "a disinterested, civilian witness." (Gov't Mem. 18.) Courts have repeatedly

recognized the crucial importance of testimony from such witnesses in a variety of contexts in

which the other witnesses were primarily or exclusively police officers, or in which police

conduct was at issue. *See, e.g.*, *Chavez v. Martinez*, 538 U.S. 760, 776 (2003) ("We . . . must

take into account the fact that [the witness] was hospitalized and in severe pain during the

interview, but also that [the witness] was a critical nonpolice witness to an altercation resulting

in a shooting by a police officer, and that the situation was urgent given the perceived risk that

Martinez might die and crucial evidence might be lost."); *U.S. ex rel. Wade v. Jackson*, 256 F.2d

7, 11 (2d Cir. 1958) ("While it is not our province to pass on the credibility of the testimony of

state troopers and police that [defendants] were not struck or kicked or mistreated at any time

thereafter, and that [defendants] were not mistreated at any time during the long hours they spent

in custody prior to arraignment, we must observe that at the Barracks no non-police or non-

prosecution witnesses were present to report what happened."), *disapproved of on other grounds

by U.S. ex rel. Daniel v. Wilkins*, 292 F.2d 348 (2d Cir. 1961); *Graham v. Springer*, No. 03-CV-

6190, 2005 WL 775901, at *3 n.2 (W.D.N.Y. Apr. 5, 2005) ("As discussed earlier, plaintiff

denies telling the officers to kill him. However, while the Court does not consider them for the

purposes of this summary judgment motion, it notes that at least three non-police witnesses

heard plaintiff yelling that he wanted the officers to kill him.").

　　　　Here, as described at length above, Mr. McKenzie provided testimony, free from any

perceived institutional bias, that largely corroborated the version of events that Officers Stewart,

Byrwa, and Bovell recounted. It is therefore unsurprising to surmise that the jury at Defendant's

federal trial decided to credit the Government's version of events, whereas the jury at

Defendant's state trial did not, in large part because of the difference in the prosecution's witness lineup at the former.  Accordingly, Mr. McKenzie's testimony significantly erodes Defendant's claim that there is a substantial likelihood that had Ms. Barley testified at his federal trial, he would have been acquitted.

AUSA Mermelstein's decision to front the apparent inconsistencies in the officers' testimony on direct examination at Defendant's federal trial to "draw the sting," *see U.S. ex Rel. Walker v. Follette*, 311 F. Supp. 490, 495 (S.D.N.Y. 1970), *aff'd*, 443 F.2d 167 (2d Cir. 1971), also starkly contrasts with ADA Nagler's decision at Defendant's state trial not to address those inconsistencies until after Ms. Gerardi had done so on cross-examination.  It is possible that ADA Nagler was unaware of those inconsistencies, or thought—erroneously, as it turned out—that the court would not permit Ms. Gerardi to use Officer Stewart's police report, evidence receipt, or prior testimony for impeachment purposes.  (*See* State Trial Tr. 231–35.)  In any event, before proceeding with its discussion, the Court pauses to note the tactical reasons why AUSA Mermelstein might have taken a different approach from ADA Nagler's, and finds the following summary of those reasons to be helpful:

> Why might the proponent want to impeach his own witness?  Suppose . . . a party is faced with having to call a witness whose testimony is essential, but whose past misdeeds subjects his credibility to an impeachment attack.  The direct examiner may attempt to mitigate "the sting" of a cross-examiner's attack on the witness's credibility by exposing the witness's shortcomings on direct.  The jury then learns of the witness's "baggage," and the direct examiner can proceed with the testimony that may be useful to his or her case.  It is not a perfect solution for the proponent, but perhaps less damaging than having the negative baggage brought out for the first time on cross-examination.

Martin A. Schwartz & John Nicodemo, *Impeachment Methods Illustrated: Movies, Novels, and High Profile Cases*, 28 Touro L. Rev. 55, 59 (2012) (footnotes omitted); *see also* Richard A. Posner, *An Economic Approach to the Law of Evidence*, 51 Stan. L. Rev. 1477, 1490 (1999)

("The witness whose credibility would be destroyed by cross-examination will not be called at all or will try to pull the sting of the cross-examiner by acknowledging on direct examination the facts that a cross-examiner could be expected to harp on.").

Reading the state-trial transcript, the Court is left with the impression that, given the number of apparent inconsistencies that Ms. Gerardi drew out on cross-examination, regarding the number of suspects, Defendant's build, and the type of weapon at issue, the jury might have felt as though the prosecution was hiding something from it during the officers' direct examination, a feeling that could have resulted in the jury ascribing little credibility to the officers' testimony.  By contrast, AUSA Mermelstein not only asked the officers about these inconsistencies on direct examination; she also structured her questions such that the officers were able to explain them.  For example, during his direct examination at Defendant's federal trial, Officer Stewart was able to tell the jury that he began filling out his police report at 5:30 in the morning, after a long night of police work, which opportunity he was not given when testifying at Defendant's state trial.  (*See* Federal Trial Tr. 48.)  The inference that the jury could have drawn from this explanation was that under those circumstances, any inconsistencies between the report and Officer Stewart's testimony were likely due to Officer Stewart's exhaustion while filling out the report, not malfeasance.  Officer Stewart also had the chance to tell the jury that there was "about, if [he] remember[ed], maybe about a hundred and some odd different boxes on that report that [had] to be checked off, and [that his errors had] just [been] some typographical mistake[s]."  (*Id.*)  Presenting the jury with these errors on cross-examination, without the context in which they were made, could have lead the jury to think that Officer Stewart was lying.  There was a much lower risk of that happening when the jury heard that Officer Stewart made them while filling out a prolix form as the sun was rising.  In a case in

67

which the credibility of the police-officer witnesses was important, the legitimacy that AUSA Mermelstein's approach lent to their statements seems to have been pivotal. It is also worth noting that in specific relation to the apparent inconsistencies between the police report and evidence receipt on the one hand and the officers' testimony on the other regarding the type of weapon—"rifle" or "handgun"—that Defendant allegedly possessed, AUSA Mermelstein effectively used Mr. McKenzie—the unbiased civilian witness—to explain that the weapon was called a "long rifle" because of the "[t]ype of ammunition used," before Ms. Brody attempted to imply anything to the contrary. (*Id.* at 179.)

Put simply, the Court does not believe that Ms. Barley's testimony was "the difference" between Defendant's state acquittal and his federal conviction. To claim as much is at best a speculative oversimplification. Again, this is not to say that Ms. Barley's testimony was not helpful to Defendant at his state trial, or that it would not have been helpful to him at his federal trial. But it is to say that Mr. McKenzie's testimony and AUSA Mermelstein's witness-examination strategy severely undercut Defendant's claim that Ms. Barley's testimony was the key to victory in state court, or that the absence of such testimony was key to the federal conviction.

### iii.  Likely Impeachment of Ms. Barley

The Government argues that, "[e]ven if [Defendant] could show that the decision not to seek a material witness warrant for [Ms. Barley] fell below an objective standard of reasonableness, he cannot show prejudice," because "had [Ms. Barley] testified at trial, she would have been subject to significant impeachment on cross examination which would have destroyed her credibility with the jury." (Gov't's Mem. 18.) Specifically, the Government claims that "[a]t the state trial, [Ms. Barley] testified that she knew [Defendant] as 'a DJ' . . . but

68

that she was not his girlfriend," and that she "further testified that [Defendant] was 'not a friend, but an associate,' that she did not know where he lived, and that she did not know him from the neighborhood."  (*Id.* at 18–19.)  However, according to the Government, in May 2012, Ms. Barley "was interviewed telephonically by Special Agent Robert Soukeras of the Bureau of Alcohol, Tobacco, Firearms and Explosives" ("Agent Soukeras"), who "noted the telephone number of the cellular telephone . . . that Ms. Barley used to communicate with him."  (*Id.* at 19.)[5]  During their conversation, Ms. Barley stated to Agent Soukeras "in sum and in substance, that [she] had not spoken to [Defendant] since around the time of the state trial," which took place in May 2011.  (*Id.*)  But after the conversation between Ms. Barley and Agent Soukeras and before Defendant's federal trial, the Government obtained phone records for the phone that Ms. Barley used to communicate with Agent Soukeras, as well as the records for a number listed on a business card for "DJ Boo Nitty" and subscribed in the name of "boo none nitty," both of which names the Government believes to be aliases for Defendant.  (*See id.*)  "Those records demonstrated that between approximately August 2011 and October 2011, there were more than 200 calls" between the phones supposedly belonging to Ms. Barley and Defendant.  (*Id.* at 19–20.)  "Thus, had [Ms. Barley] testified, she almost certainly would have testified that, as she told Agent Soukeras, she was not friends with [Defendant] and had not spoken to him at all since the time of the first trial," but "[t]he Government would have confronted [Ms. Barley] with phone records demonstrating the falsity of her statements to Agent Soukeras and the proof that she was in frequent contact with [Defendant]."  (*Id.* at 20.)

---

[5] The Government submitted an affirmation from Agent Soukeras along with its Memorandum.  (*See* Aff. of Special Agent Robert Soukeras (Dkt. No. 34).)

"[T]he Second Circuit has specifically noted that the failure to call an [exculpatory] witness [who] would likely face effective impeachment cannot constitute ineffective assistance of counsel" under the "second prong of [the] *Strickland* test." *Schulz*, 528 F. Supp. 2d at 93; *see also United States v. Aiello*, 900 F.2d 528, 532–34 (2d Cir. 1990) ("[The defendant] complains that [counsel] failed to call two critical exculpatory witnesses . . . . [But] any exculpatory testimony they might have provided, had [counsel] elected to call them, would have been impeachable . . . . In sum . . . it certainly cannot be said that but for [counsel's] unprofessional errors [the defendant] would not have been convicted." (internal quotation marks omitted)); *cf. United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) ("[The defendant] now claims that the author of the letter would have testified that the letter had been hand-delivered and that it was incompetent for [counsel] to stipulate to the contrary. . . . [But] had the author been called to take the stand to testify to hand delivery, his testimony would have been impeached by his previous letter maintaining that it had been mailed.").

District courts within the Second Circuit have followed suit, in response to defendants' claims that their counsel was ineffective for failing to call, as well as to interview, potentially exculpatory but readily impeachable witnesses. *See, e.g.*, *Baldwin*, 2013 WL 593770, at *3 & n.2 ("The court cannot conclude that [the witness's] testimony—even if favorable to the defense—would have led to a different outcome for [the defendant]. . . . [E]ven if [the witness] [had] testified that [the defendant] never had narcotics dealings with him, his testimony would be subject to impeachment based on his prior inconsistent statements. There is no reason to believe that the jury would have credited [the witness's] testimony as truthful in light of the government's impeachment."); *Archer v. Fischer*, No. 05-CV-4990, 2009 WL 1011591, at *33 (E.D.N.Y. Apr. 13, 2009) ("[T]he failure to call certain witnesses would not have affected the

70

outcome of the trial given that their alleged testimony would have been cumulative of the other

defense witnesses at the trial and subject to impeachment on various grounds."), *aff'd sub nom.*

*Mannix v. Phillips*, 619 F.3d 187 (2d Cir. 2010); *Nunez v. Conway*, 473 F. Supp. 2d 465, 474–75

(S.D.N.Y. 2007) ("Petitioner argues that he was denied effective counsel because his attorney

did not interview [the witness] or called [sic] her to testify. . . . [But the witness] had been

drinking for several hours before the incident . . . . [S]he also had a criminal charge pending at

the time of Petitioner's trial . . . ; her testimony may have been impeached on cross examination

by the prosecution. . . . It is . . . not clear that [the witness's] testimony would have changed the

result of the proceeding."); *cf. Rivera v. Scully*, No. 92-CV-6659, 1993 WL 454209, at *6

(S.D.N.Y. Nov. 2, 1993) ("The second example of ineptitude to which petitioner refers is

counsel's failure to call petitioner's brother as an exculpatory witness. . . . [However,]

[p]etitioner's brother . . . was not a disinterested witness whose testimony would have turned the

tide for petitioner. In fact, according to the evidence presented, he not only is petitioner's

brother but also was his accomplice and therefore would have been easily impeached."), *aff'd*,

40 F.3d 1237 (2d Cir. 1994).

Thus, the Government stands on firm legal ground in making its impeachment argument

on the prejudice prong. But its factual ground is more nuanced. The Government assumes that,

had Ms. Brody called Ms. Barley at Defendant's federal trial, Ms. Barley would have answered

the question of whether she had spoken to Defendant "since around the time of the state trial" on

cross-examination in similar fashion to the way in which she answered that question when asked

by Agent Soukeras—by denying that she had done so. But what if she had responded by stating

that she had indeed spoken to Defendant since that date? And that she had reason to speak to

Defendant hundreds of times in the wake of his state trial for business or "partywise" reasons,

given her prior description of their relationship as "associates"?  (*See* State Trial Tr. 376–77.)

As Mr. Patel suggested in his questioning of Ms. Brody at the evidentiary hearing, it might have

turned out that Ms. Barley had a "perfectly rational explanation for the telephone records": that

she and Defendant were not good friends, but that she called Defendant all the time to find out

"where he's DJ'ing," because she "follow[s] him."  (Hr'g Tr. 27–28 (internal quotation marks

omitted).)

      Nevertheless, given the possibility that Ms. Barley could have exposed herself to

potential prosecution under 18 U.S.C. § 1001 had she not answered AUSA Mermelstein in the

same way that she answered Agent Soukeras, it seems more likely than not that she would have

done so.  *See* 18 U.S.C. § 1001(a)(2) (criminalizing the knowing and willful making of "any

materially false, fictitious, or fraudulent statement or representation" "in any matter within the

jurisdiction of the executive, legislative, or judicial branch of the Government of the United

States").  And if this had been the case, the impeachment value of phone records demonstrating

that she had not only spoken with Defendant since his state trial, but potentially spoken with him

*more than 200 times*, likely would have been considerable.  Further, even if she had not

answered AUSA Mermelstein as she answered Agent Soukeras, and even if she provided the

explanation for the phone calls theorized by Mr. Patel, she still would have had to explain her

prior inconsistent statement to Agent Soukeras.  Perhaps she would have stated that she had been

mistaken, or given some other seemingly innocuous explanation, but the fact that she might have

said one thing to the agent and another on the stand likely would have caused her to take some

hit to her credibility in the jury's eyes.  In any event, Ms. Barley also would have had to explain

the need to call Defendant more than 200 times in only a two-month period if her only interest in

him was his work as a DJ.

An additional point bears mentioning.  Regardless of the way in which the phone records would have been used by the Government—as proof of prior inconsistent statements, or as evidence of the close nature of Ms. Barley and Defendant's relationship—the jury at Defendant's federal trial would have undoubtedly understood that Ms. Barley and Defendant's relationship was much more extensive than the jury at his state trial was led to believe.  Ms. Barley would have appeared to be a far less removed, uninvolved, and unbiased witness, and as such, Defendant's federal jury likely would have given her testimony less weight than did his state jury.  As such, Ms. Barley's statements to Agent Soukeras and the Government's phone records, regardless of how Ms. Barley and the defense would have decided to handle them, also seriously damage Defendant's claim that Ms. Barley's testimony would have caused his federal jury to acquit.

These three reasons lead the Court to find that Defendant has not established that there is a reasonable probability or a substantial likelihood that, had Ms. Brody interviewed Ms. Barley in person prior to Defendant's federal trial, or requested a material-witness warrant or continuance when Ms. Barley did not appear, the result of his trial would have been different.

### 2.  Ms. Brody's Failure To Seek the Introduction of Ms. Barley's Testimony Under Rule 804(b)(1) of the Federal Rules of Evidence

The Court need only briefly address Defendant's argument that Ms. Brody was ineffective for failing to "move to admit Ms. Barley's state trial testimony as prior testimony of an unavailable witness" under Rule 804(b)(1) of the Federal Rules of Evidence.  (Def.'s Mem. 10.)  Rule 804(b)(1) permits the introduction of hearsay evidence when the declarant is unavailable, and where the evidence sought to be introduced is "[t]estimony that . . . was given as a witness at a trial . . . , whether given during the current proceeding or a different one;

73

and . . . is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1).  Assuming *arguendo* that Ms. Barley was in fact an unavailable declarant, Defendant's argument still runs squarely into Second Circuit precedent.

In *United States v. Peterson*, 100 F.3d 7 (2d Cir. 1996), the Second Circuit was presented with the issue of whether Rule 804(b)(1) permitted the introduction of an unavailable declarant's testimony from a previous state proceeding at a subsequent federal trial.  The court found that it did not, as in such situations the United States ordinarily will not have been a "party to the [state] proceedings." *Id.* at 12.  The court observed that "[i]t has been well established in various contexts that the federal government and a state government are separate sovereigns." *Id.*  In other words, the United States did not have "an opportunity . . . to develop [the state testimony] by direct, cross-, or redirect examination."  Fed. R. Evid. 804(b)(1)(B); *see also United States v. Guerrero*, No. 09-CR-339, 2010 WL 1645109, at *2 (S.D.N.Y. Apr. 20, 2010) ("*Peterson* has been applied in circumstances strikingly similar to the instant case. . . .  Accordingly, as the federal Government was not a party to the [prior state court] proceedings . . . , the testimony of [the unavailable declarant] is inadmissible hearsay."); *United States v. Amato*, No. 03-CR-1382, 2006 WL 1788190, at *2 (E.D.N.Y. June 26, 2006) ("The Second Circuit in *Peterson* specifically held that prior testimony taken during a state prosecution is inadmissible in a federal prosecution under the dual sovereign doctrine.  As the federal and state governments are different parties, testimony [from unavailable witnesses] offered at [the defendant's] state trial is therefore inadmissible under Rule 804(b)(1)." (citation omitted)).

However, the *Peterson* court did note that "[t]he dual sovereignty concept may yield . . . if one sovereign effectively controlled the other, for example if the state prosecution was a sham

74

and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." *Peterson*, 100 F.3d at 12 (internal quotation marks omitted). But just as was the case in *Peterson*, Defendant "has presented no such evidence here." *Id.* "The federal authorities' decision to prosecute was apparently made later." *Id.* "[Defendant] has made no showing that the federal government was in any way party to, or had any opportunity to develop [Ms. Barley's] testimony at, [Defendant's] state [trial]." *Id.* at 12–13. Mr. Patel even admitted as much at the evidentiary hearing. (*See* Hr'g Tr. 34 ("THE COURT: If we were to say, 'Well, [Ms. Brody] should have at least tried to offer the state court testimony,' the *Peterson* case would have foreclosed that argument, unless she could have shown somehow that it was a sham, that [AUSA Mermelstein] and her colleagues were the puppeteers and they were having the D.A.'s Office bring the case. MR. PATEL: That wasn't happening." (emphasis added)).)

Because any attempt Ms. Brody might have made to introduce Ms. Barley's prior testimony under Rule 804(b)(1) would have been unsuccessful, it cannot have been objectively unreasonable for her to decide not to make that attempt, nor can Defendant have been prejudiced in any way by that decision. *See United States v. Abad*, 514 F.3d 271, 275–76 (2d Cir. 2008) ("[A]ny defense motion . . . would have been denied by the District Court. [The defendant's] counsel could not therefore have been ineffective for failing to make a motion that would have been futile."); *cf. Rodriguez v. Brown*, No. 11-CV-1246, 2011 WL 4073748, at *3 (E.D.N.Y. Sept. 13, 2011) ("Because [the] motion . . . would have been properly denied, the [state court] could also reasonably have concluded that petitioner was not prejudiced. As there was no showing of . . . prejudice, the [state court] did not unreasonably apply *Strickland*.").

III.  CONCLUSION

For the reasons given herein, Defendant's Motion for a New Trial is denied.  The Clerk

of Court is respectfully requested to terminate the pending Motion.  (*See* Dkt. No. 23.)

SO ORDERED.

Dated:     July **28**, 2014
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

76